## ATTORNEY GENERAL v RILEY

Docket No. 70876. Argued January 24, 1983 (Calendar No. 1).—Decided February 11, 1983. Decided on reconsideration February 15, 1983.

Justice Blair Moody, Jr., was re-elected to an eight-year term as Associate Justice of the Supreme Court on November 2, 1982. He died on November 26, 1982. Governor William G. Milliken appointed Dorothy Comstock Riley, a judge of the Court of Appeals, to the vacancy. The appointment was for a term commencing on December 9, 1982, and concluding at noon on January 1, 1985. Justice Riley took the oath of office as a Justice of the Supreme Court on December 9, 1982. The Attorney General brought a complaint for quo warranto in the Court of Appeals, challenging Justice Riley's right to hold office after 12 noon on January 1, 1983, when Justice Moody's term of office would have expired and his new term would have begun. The Supreme Court granted the Attorney General's motion for leave to appeal prior to decision by the Court of Appeals. The Attorney General argues that Justice Riley's term of office should run only until expiration of the term Justice Moody was serving when he died, noon of January 1, 1983, and not for the first two years of the term for which he was elected, but for which he had not qualified at the time of his death. Justice Riley argues that under the Constitution of 1963 she holds the office of Justice of the Supreme Court until noon of January 1, 1985, and that under the election law a Justice of the Supreme Court holds office until a successor is elected and qualified.

On February 11, 1983, the Court being equally divided upon the question, the complaint for quo warranto was ordered to be dismissed. Separate opinions for a judgment of ouster were filed by Chief Justice Williams and Justices Kavanagh and Cavanagh, and for dismissal of the complaint by Justice Ryan, joined by Justice Brickley, and by Justice Levin. On February

REFERENCES FOR POINTS IN HEADNOTES

[1] 16 Am Jur 2d, Constitutional Law §§ 92, 100, 111.
[2-10, 12, 13] 46 Am Jur 2d, Judges §§ 16, 239, 240.
[8, 10] 46 Am Jur 2d, Judges § 237.
[11] 46 Am Jur 2d, Judges § 16.

15, 1983, upon reconsideration on the Court's own motion, there then being four justices who voted for ouster, a judgment of ouster was entered. Justice Levin filed a further opinion on February 16.

Chief Justice Williams would hold that the appointment of Justice Riley was effective only until noon, January 1, 1983. At that time the office was vacant, and the Governor has the power to make an appointment.

1. The constitution provides that the term of office of a Supreme Court justice is eight years. When a vacancy in the office occurs, it must be filled by appointment by the Governor. The person appointed holds office until 12 noon of the first day of January next succeeding the first general election held after the vacancy occurs.

2. In construing the constitution, the interpretation to be given it is that which reasonable minds, the great mass of the people themselves, would give it. The constitution derives its force not from its framers, but from the people who ratified it. The intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but have accepted them in their most obvious and common-sense meaning and ratified the instrument in the belief that that was the sense which they conveyed.

3. All parts of the constitution must be construed together if possible. The section of the constitution which prescribes the term of office of a Supreme Court justice does not authorize a justice to hold over at the end of a term of office. There is no holdover language in the section; the lack of such language contrasts sharply with the holdover language of the sections which prescribe the terms of office of the judges of other courts; the general historical rule has been to exclude holdover language; a holdover provision is not to be read into the silence of the constitution; and language in the election law which might be construed to authorize a holdover cannot contravene the constitution. The section of the constitution which prescribes the method of filling a vacancy, if read to provide for a holdover, would give rise to an absurd situation in which a person elected to succeed an incumbent justice could be displaced by an appointee if the incumbent died before the end of his term. Additionally, such a construction would apply only to appointees, and would not permit a holdover by elected justices. However, if this section is read in conjunction with the section prescribing the term of office, the absurdity disappears because the appointment will terminate either by replacement of the

appointee by a person elected after the vacancy occurs or by the termination of the eight-year term in which the vacancy arose. Thus, the provision authorizing the filling of a vacancy is not a holdover provision. Rather, it authorizes the Governor to appoint a person to a term which extends only to the end of the eight-year term in which the vacancy occurs, and any effort to extend the appointment into a succeeding eight-year term is void. In this case, Justice Riley's term extended to the end of the eight-year term being served by Justice Moody at the time of his death, 12 noon of January 1, 1983, and not 12 noon of January 1, 1985, after the next election.

4. The people have expressed their intent to reserve to themselves the right to choose justices of the Supreme Court by popular election, and have singlemindedly and tenaciously rejected adoption of an appointed judiciary. In 1963, the power to fill a vacancy on the Court was taken away from the Governor, and only later reluctantly restored by amendment in 1968. The holdover period enacted by the Legislature under the previous constitution was deleted by prescribing the term of office in the present constitution.

5. Justice Moody's death created a vacancy in the term which he was serving at the time of his death. His death also caused a vacancy to exist in the succeeding term to which he had been elected. Additionally, there was a "vacating of the office" in the new term because the person elected to the office, Justice Moody, failed to qualify and take office. Because Governor Milliken had the power to appoint Justice Riley only until noon, January 1, 1983, the office became vacant at noon on January 1, 1983, and the current Governor may make appointment to fill the vacancy for a term extending until noon, January 1, 1985.

Justice Kavanagh would hold that a vacancy in the office of justice of the Supreme Court can arise only in a term of that office and that a person appointed to fill the vacancy may not serve beyond the end of that term.

1. The constitution provides for filling vacancies in the office of justice of the Supreme Court. The Governor has the power to fill such vacancies, limited, however, by the definition of the duration of the appointee's right to hold office. An appointee fills the remainder of the unexpired term until the next general election can be held. For an appointee to fill a vacancy beyond the end of the term of the office would be self-contradictory.

2. The term of office of a justice of the Supreme Court is fixed by the constitution, and an elected holder of the office possesses no contingent right to sit beyond the term. The death of an

incumbent one month prior to the expiration of his term cannot give his appointed successor the right to extend the term for two years where the incumbent could not have done so. An appointee cannot be clothed with greater rights than those held by the predecessor.

3. The section of the election law which Justice Riley argues permits a holdover was last amended before the adoption of the constitution. Only statutes which predate the constitution and are not repugnant to it have any force. The Legislature may not increase or diminish a constitutional term of office. Any statute which attempts to add to the term is void.

4. Holdover language in the constitution with respect to the terms of offices of judges of other courts is conspicuously absent from the sections pertaining to the term of office of justices of the Supreme Court. The appointment to fill a vacancy in the final months of a term of office must end with the term. The appointee cannot succeed to rights greater than those held by the vacating justice.

5. A public officer may validly make a prospective appointment to fill a vacancy certain to occur in a public office only where the appointing officer would be empowered to fill the vacancy when it actually occurs. There was no vacancy to be filled in the term to which Justice Moody had been elected until that term began at 12 noon, January 1, 1983. The Governor in office at the beginning of that term has the power to fill that vacancy.

Justice Cavanagh would hold that in the light of the express desire of the people for an elected judiciary to serve eight-year non-holdover terms, an appointed justice may not hold over into a new term of office.

1. The appointed justice may serve not more than two years, until the next general election or to the end of the term in which the appointment was made, whichever occurs first. The people did not contemplate, in adopting the constitutional amendment, that an appointed replacement for an incumbent justice would serve beyond the term of the predecessor in office. The rights of the successor cannot be greater than those of the person replaced. Thus, the common understanding of the people when adopting the constitution was that the successor would serve for the remainder of the unexpired term in existence at the time the appointment was made.

2. The term to which Justice Moody was elected before his death became vacant on January 1, 1983, by reason of his death. The fact that his death did not actually occur in the new term is not inimical to this interpretation; there was still a

vacancy created by his death because he was unable to fill the office to which he had been re-elected. Such an analysis is preferable to the conclusion that there was a vacating of the office during the new term because Justice Moody failed to qualify and assume the office, because one cannot vacate an office he has not assumed. The constitution permits the Legislature to provide the cases in which an office shall be vacant and the manner of filling the vacancy where no provision is made in the constitution. The election law provides that a vacancy in the office of justice of the Supreme Court occurs when the person elected or appointed neglects or refuses to take the oath of office. Thus, when Justice Moody failed to take the oath of office, a vacancy arose in that term of office.

Justice Ryan, joined by Justice Brickley, would hold that Justice Riley holds the office of justice of the Supreme Court under the authority of the constitution and, in the alternative, under the authority of the election law, until a successor is elected and qualified.

1. The constitution provides that a vacancy shall occur in the office of judge of any court upon the death of an incumbent and that the vacancy shall be filled by appointment by the Governor. The person appointed holds office until 12 noon of the first day of January next succeeding the first general election after the vacancy occurs. The duration of the appointee's tenure is stated in plain, simple, and direct language which explicitly authorizes an appointee to hold over in office until January 1 after the next general election. The general language of the constitution which fixes the term of Supreme Court justices at eight years cannot and does not prohibit appointee holdover which is specifically authorized by the section on filling of vacancies. In this case, the next general election to be held after the vacancy occurred will be November, 1984, and, thus, Justice Riley's term extends until 12 noon, January 1, 1985.

2. The constitution does not provide that a person appointed to fill a vacancy in the office of justice of the Supreme Court may hold office until after the next general election or until the original term would have expired, whichever comes first. Nor does the section of the constitution which provides for the length of the term prohibit an appointee from serving a special interim term or portions of two different terms. The language of the constitution specifically and certainly fixes the very date and hour of the expiration of an appointee's tenure. Previous constitutions, and the present constitution before amendment, provided that an appointee held office until a successor was elected and qualified. Both the new and the old holdover

language provide that an appointee may serve until the happening of an ascertainable event, an event which may occur before, at, or after the end of the term in which the vacancy occurred.

3. At the general election next following a vacancy, a successor is elected for the remainder of the unexpired term. The phrase "unexpired term" refers to the regular eight-year cycle or "term" in which the appointee is serving at the time of the election. When a vacancy occurs, on the first day of January next succeeding the first general election held after the vacancy occurs, two, four, or six years will remain to be served in the term in which the vacancy occurred, or no time will remain to be served in that term and eight years will remain in the ensuing term, or six years will remain to be served in the term following that in which the vacancy occurred. Thus, "the unexpired term" refers to the remainder of the term being served by the appointee when the general election occurs, including a term which began after the term in which the vacancy occurred but in which the appointee served by virtue of the fact that the vacancy occurred immediately after a general election in a term soon to end.

4. The possibility of an appointed justice serving until January following the next general election is plainly not unjust or absurd under the facts and circumstances of this case. A literal reading of the constitution in which a holdover by an appointee might produce an absurd and unjust result in a hypothetical case does not justify an interpretation of the constitution which would never allow an appointee to serve beyond the date on which the term in which a vacancy occurs was scheduled to expire. Where a successor has been elected before a vacancy occurs, it is unnecessary, unreasonable, and improper for an appointee to serve beyond the expiration date of the term in which he is appointed. However, where, as in this case, an appointee's successor has not been elected and will not be elected until the next general election, the constitution authorizes the appointee to hold office until 12 noon of the first day of January after the general election.

5. A vacancy occurs in the office of justice of the Supreme Court upon the death, removal, resignation, or vacation of the office by the incumbent. A vacancy does not arise upon the expiration of the term during which an appointee takes office. It is a vacancy in the "office" rather than completion of a "term" which gives rise to a Governor's power of appointment. Only one vacancy occurred upon the death of Justice Moody, and only one power of appointment was created in the Gover-

nor. The power was exercised in the appointment of Justice Riley to serve until January 1 after her successor is elected. A second vacancy did not occur on January 1, 1983.

6. Michigan constitutional and legislative history favors appointee holdover. Before the ratification of the Constitution of 1963, Michigan had an uninterrupted history of constitutional provision for holdover by appointees to fill a vacancy on the Supreme Court until a successor was elected and qualified, with statutory implementation declaring when such election would occur. The Constitution of 1963, while doing away entirely with gubernatorial appointment to vacancies on the Supreme Court, continued the historical tradition of allowing holdovers. The restoration, by amendment, of the power of gubernatorial appointment perpetuated the historical preference by incorporating a provision fixing with specificity the time at which the election of an appointee's successor would be held.

7. The election law provides that an appointee may remain in office until a successor is elected and qualified. That provision does not conflict with the constitution. The deletion of the holdover clause from the section of the constitution specifying the length of the term of a justice of the Supreme Court was inadvertent; there was not overwhelming sentiment during the constitutional convention to change the holdover clause. In any event, interpretation of a constitution is governed by the common understanding of the people who adopted it, not the unrevealed intentions of its drafters. It is not possible to conclude that the voters read the constitution as affirmatively prohibiting holdover in the absence of language of prohibition. The absence of language in the constitution with respect to holdover of justices neither requires nor forbids justices from holding over. The Legislature was free to provide for holdover by statute. Every statute is clothed with a presumption of constitutionality, and every attempt should be made by the Court to harmonize the statute with the constitution and to so construe it unless the contrary clearly appears.

Justice Levin, in his opinion of February 11, wrote that the section of the constitution which provides for the filling of a vacancy in the office of justice of the Supreme Court does not clearly answer the question whether the vacancy created by the death of Justice Moody may be filled by the former or the present Governor. The answer depends upon an evaluation of competing policy arguments concerning the composition of the Supreme Court which it is not appropriate for the Supreme Court to make. Such a decision would encroach upon the right of the people to decide who sits on the Supreme Court and to

recognize who will be designated as an incumbent in the 1984 election. Rather, the Court should adopt a position of neutrality. No judgment of ouster should issue at this time with respect to the appointment of Justice Riley or with respect to any appointment by the present Governor to fill Justice Moody's seat temporarily until 12 noon, January 1, 1985.

Justice Levin, in his opinion filed February 16, addressed the effect of the three views expressed by the justices on the question whether Governor Milliken had the power to appoint Justice Riley for the period beginning January 1, 1983, or of an equal division of the Court on that question on Justice Riley's authority to exercise the powers of a justice of the Supreme Court. On consideration of the effect of the five opinions, the ultimate question is not whether one Governor or another is empowered to make an appointment for the period beginning January 1, 1983, but whether, by virtue of Governor Milliken's appointment, Justice Riley is empowered to exercise the power of office of justice. Unless a majority of at least four justices agree that Justice Riley has been so empowered, her authority to act has not been adjudicated favorably to her claim of authority. Absent such an adjudication, she should not and cannot exercise the power of the office. Because less than four votes were garnered in recognition of her authority from and after January 1, 1983, a judgment of ouster should be issued.

OPINION BY WILLIAMS, C.J.

1. CONSTITUTIONAL LAW — CONSTRUCTION.

   *The Constitution of 1963 derives its force not from its framers, but from the people who ratified it; in construing it, all of its parts must be construed together if possible, and the intent underlying its language is that of the people, taken in its most obvious and common-sense meaning.*

2. CONSTITUTIONAL LAW — SUPREME COURT — JUSTICES — TERM OF OFFICE — VACANCIES.

   *The constitution does not authorize a justice of the Supreme Court to hold over at the end of a term of office; where a vacancy occurs in the office of justice, the Governor is authorized to appoint a person to a term which extends only to the end of the eight-year term in which the vacancy occurs and not into the succeeding eight-year term of office, language in the election law which might be construed to authorize a holdover notwithstanding (Const 1963, art 6, §§ 2, 23; MCL 168.399, 168.404; MSA 6.1399, 6.1404).*

3. CONSTITUTIONAL LAW — SUPREME COURT — JUSTICES — TERM OF OFFICE — VACANCIES.

*The Governor has the power to appoint a person to fill a vacancy in the office of justice of the Supreme Court for a term of office extending until 12 noon of the first day of January next succeeding the first general election held after the vacancy occurs but not to exceed the duration of the eight-year term in which the vacancy occurs; where the event which causes the vacancy to exist in one term occurs after a general election but before the end of the term of office, thereby causing a vacancy to exist in the succeeding term, the person appointed to the vacancy may not serve beyond the end of the first term, and the Governor may make an appointment to fill the vacancy in the succeeding term until 12 noon of the first day of January next succeeding the next general election (Const 1963, art 6, § 23; MCL 168.404; MSA 6.1404).*

OPINION BY KAVANAGH, J.

4. CONSTITUTIONAL LAW — SUPREME COURT — JUSTICES — TERM OF OFFICE — VACANCIES.

*The term of office of a justice of the Supreme Court is fixed by the constitution, and an elected holder of the office possesses no contingent right to sit beyond the term; a person appointed to fill a vacancy in the office of justice caused by the death of the incumbent one month prior to the expiration of his term cannot be clothed with greater rights than his predecessor and thus cannot extend the term for two years where the incumbent could not have done so (Const 1963, art 6, § 2).*

5. CONSTITUTIONAL LAW — SUPREME COURT — JUSTICES — TERM OF OFFICE — VACANCIES.

*Holdover language in the Constitution of 1963 with respect to the terms of offices of judges of other courts is conspicuously absent from the provisions pertaining to the term of office of justices of the Supreme Court; thus the term of office of a person appointed to a vacancy in the office of justice must end with the term in which the vacancy occurred (Const 1963, art 6, §§ 9, 12, 16, 23).*

6. CONSTITUTIONAL LAW — SUPREME COURT — JUSTICES — TERM OF OFFICE — VACANCIES.

*A public officer may validly make a prospective appointment to fill a vacancy certain to occur in a public office only where the appointing officer would be empowered to fill the vacancy when it actually occurs; thus, where the death of an incumbent justice of the Supreme Court occurs after a general election in*

which the incumbent was elected to a succeeding term of office and a new Governor was also elected, a vacancy occurs in both terms of the office of justice, but only the Governor in office at the beginning of the succeeding term has the power to fill that vacancy (Const 1963, art 6, § 23).

OPINION BY CAVANAGH, J.

7. CONSTITUTIONAL LAW — SUPREME COURT — JUSTICES — TERM OF OFFICE — VACANCIES.

The people, in adopting the amendment to the Constitution of 1963 which authorizes the Governor to appoint a person to fill a vacancy in the office of justice of the Supreme Court, intended that the person appointed would not be able to hold over into a new term of office, but would serve no longer than the remainder of the unexpired term in existence at the time the appointment was made (Const 1963, art 6, § 23).

8. CONSTITUTIONAL LAW — SUPREME COURT — JUSTICES — TERM OF OFFICE — VACANCIES.

The Constitution of 1963 permits the Legislature to designate the instances in which an office shall be vacant and the manner in which the vacancy may be filled where no provision is made in the constitution; the election law provides that a vacancy in the office of justice of the Supreme Court occurs when the person elected or appointed neglects or refuses to take the oath of office; thus, where a person elected or appointed to the office of justice fails to take the oath of office by reason of death, a vacancy arises in that term of office (Const 1963, art 4, § 38; MCL 168.402; MSA 6.1402).

OPINION BY RYAN, J.

9. CONSTITUTIONAL LAW — SUPREME COURT — JUSTICES — TERM OF OFFICE — VACANCIES.

The Constitution of 1963, in plain, simple, and direct language, explicitly authorizes a person appointed by the Governor to fill a vacancy in the office of judge of any court upon the death of an incumbent to hold office until 12 noon of the first day of January next succeeding the first general election after the vacancy occurs and does not forbid the appointee to hold over where the vacancy occurs after the general election in one term and the next general election occurs in the succeeding term (Const 1963, art 6, § 23).

10. CONSTITUTIONAL LAW — SUPREME COURT — JUSTICES — TERM OF OFFICE — VACANCIES.

   *A vacancy occurs in the office of justice of the Supreme Court upon the death, removal, resignation, or vacation of the office by the incumbent and not upon the expiration of the term in which a person appointed to fill the vacancy takes office; it is a vacancy in the "office" rather than completion of a "term" which gives rise to a Governor's power of appointment (Const 1963, art 6, § 23).*

11. CONSTITUTIONAL LAW — SUPREME COURT — JUSTICES — TERM OF OFFICE — HOLDOVER.

   *The absence of language in the Constitution of 1963 with respect to holdover of a justice of the Supreme Court neither requires nor forbids justices to hold over, and, thus, the Legislature was free to provide for holdover by statute (MCL 168.399; MSA 6.1399).*

OPINION BY LEVIN, J.

12. CONSTITUTIONAL LAW — SUPREME COURT — JUSTICES — TERM OF OFFICE — VACANCIES.

   *The Constitution of 1963 does not clearly provide for resolution of the question whether a vacancy in a succeeding term in the office of justice of the Supreme Court which is created by the death of an incumbent who has been re-elected to the succeeding term may be filled by a Governor whose term of office expires at the same time as the incumbent justice's term would have expired or whether the vacancy should be filled by the succeeding Governor; the resolution depends on an evaluation of competing policy arguments concerning the composition of the Supreme Court which it is not appropriate for the Supreme Court to make and would encroach upon the right of the people to decide who is to sit on the Supreme Court and to recognize who will be designated as an incumbent in the next general election.*

OPINION BY LEVIN, J.

13. QUO WARRANTO — SUPREME COURT — JUSTICES — VACANCIES.

   *Unless a majority of justices agree that a person appointed by a Governor to fill a vacancy in the office of justice of the Supreme Court is empowered to exercise the power of office, authority to act has not been adjudicated and the appointee should not and cannot exercise the power of office.*

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Thomas L. Casey, Michael J. Moquin,* and *Donald E. Erickson,* Assistants Attorney General, for the Attorney General.

*Buesser, Buesser, Snyder & Black (by Frederick G. Buesser, III)* for Justice Riley.

Amicus Curiae:

*James J. White* for Governor Milliken.

WILLIAMS, C.J. This is a case of first impression. It concerns the interpretation of art 6, § 23 of the 1963 Michigan Constitution, as amended. It also requires consideration of art 6, § 2. The issue is whether a Governor can appoint to fill a Supreme Court justice vacancy not only for a part of the term in which the vacancy occurs, but also for a part of the next succeeding term. Specifically, the issue is whether "the remainder of the unexpired term" as designated in § 23 refers to the term in which the "vacancy occurs" or the term in which the "election" takes place, when the "vacancy" and "election" occur in different terms. The pertinent language of art 6, § 23 is the second sentence which reads as follows:

"The person appointed by the governor shall hold office until 12 noon of the first day of January next succeeding the first general election held after the vacancy occurs, at which election a successor shall be elected for the remainder of the unexpired term."

We find that, while there may be a slight tilt in the language favoring the interpretation that the appointment is restricted to the term in which the vacancy occurs, the language may arguably be

interpreted either to limit the appointed term to the eight years in which the vacancy occurs, or to extend the appointed term into the next eight-year term. However, we are convinced that the injustice that can arise from the extended appointment term, combined with the historical preference for an elected judiciary and non-holdover Supreme Court terms, indicates that the more limited appointment was the intent of the people. We would therefore in the instant case find that the appointed term should have been until noon January 1, 1983. Additionally, since the remainder of the purported appointment is void, the present Governor is authorized to make an appointment as of noon January 1, 1983.

## I. FACTS

On November 2, 1982, the Honorable BLAIR MOODY, JR., an incumbent Associate Justice of the Michigan Supreme Court, was re-elected to a new eight-year term of office on this Court. His then current term of office was due to expire 12 noon on January 1, 1983. Prior to the taking of the constitutionally required oath of office for the new term, BLAIR MOODY, JR., died on November 26, 1982.

On December 9, 1982, the Governor appointed defendant Court of Appeals Judge DOROTHY COMSTOCK RILEY to fill the vacancy. The appointment read:

"To the Secretary of State: Let a commission bearing date December 9, 1982 issue to Dorothy Comstock Riley * * * as Justice of the Michigan Supreme Court, to serve until 12:00 noon of the first day of January, 1985 (to fill the vacancy created by the death of the Honorable Blair Moody, Jr.)".

Defendant filed the oath of office on the same day and assumed office.

On January 3, 1983, the Attorney General filed this action for quo warranto in the Court of Appeals. Bypass was granted after the issue was argued before this Court on January 8, 1983, pursuant to GCR 1963, 852.

## II. CONSTITUTIONAL AND STATUTORY PROVISIONS

Several constitutional and statutory provisions are involved in the analysis of this situation. The term of office for a Supreme Court justice is established in Const 1963, art 6, § 2, which provides:

"The supreme court shall consist of seven justices elected at non-partisan elections as provided by law. The term of office shall be *eight years* and not more than two terms of office shall expire at the same time." (Emphasis added.)

The prior Constitution, ratified in 1908, required the Legislature to set the term of office. Pursuant to this authority, the Legislature in 1954 provided:

"The term of office of justice of the supreme court shall be *8 years,* beginning on the first day of January next following the election *and shall continue until a successor is elected and qualified."* (Emphasis added.) MCL 168.399; MSA 6.1399 (1954 PA 116).

The 1963 Constitution before amendment in 1968 also included a mechanism to be used to fill vacancies which may arise for a variety of reasons, for example death or removal. As ratified in 1963, the Constitution provided in art 6, § 23:

"A vacancy in the elective office of a judge of any court of record shall be filled at a general or special

election as provided by law. The supreme court may authorize persons who have served as judges and who have retired, to perform judicial duties for the limited period of time from the occurrence of the vacancy until the successor is elected and qualified. Such persons shall be ineligible for election to fill the vacancy."

This was a marked change from the previous Constitution which granted the Governor the power to make vacancy appointments. The convention comment explained:

"The change is made in order to maintain consistency in the idea that this state should have an elected judiciary. The present system of appointment by the governor to fill vacancies, bestowing on the appointee the incumbency designation, has had an overwhelming tendency to insure the election of the appointee. This has created in effect an appointive judiciary."

However, in 1968, § 23 was amended to reinstate the Governor's power to fill vacancies. Article 6, § 23, now reads:

"A vacancy shall occur in the office of judge of any court of record or in the district court by death, removal, resignation or vacating of the office, and such vacancy shall be filled by appointment by the governor. The person appointed by the governor shall hold office until 12 noon of the first day of January next succeeding the first general election held after the vacancy occurs, at which election a successor shall be elected for the remainder of the unexpired term. Whenever a new office of judge in a court of record, or the district court, is created by law, it shall be filled by election as provided by law. The supreme court may authorize persons who have been elected and served as judges to perform judicial duties for limited periods or specific assignments."

The 1968 amendment was also reflected in the

legislative provision which implemented the Constitution. The 1970 act reads:

"Whenever a vacancy shall occur in the office of justice of the supreme court, the governor shall appoint a successor to fill the vacancy. The person appointed by the governor shall be considered an incumbent for purposes of this act and shall hold office until 12 noon of January 1 following the next general election at which a successor is elected and qualified. At the next general November election held at least 90 days after such vacancy shall occur, a person, nominated under section 392, shall be elected to fill such office, and the person so elected shall hold such office for the remainder of the unexpired term. A candidate receiving the highest number of votes for said office and who has subscribed to the oath as provided in section 1 of article 11 of the state constitution shall be deemed to be elected and qualified, even though a vacancy occurs prior to the time he shall have entered upon the duties of his office." MCL 168.404; MSA 6.1404.

In *Schwartz v Secretary of State,* 393 Mich 42, 47; 222 NW2d 517 (1974), this Court made the following observation on the amendment:

"[T]he people intended to rectify the mistake of the 1963 Constitution in its original form of having removed the historic constitutional authority of the Governor to appoint persons to fill judicial vacancies. This Court would blink the facts of life if it did not take judicial notice of the fact that this omission embarrassed the operation of government by leaving important judicial offices without their own regular incumbent for long periods of time."

Defendant also points out that MCL 168.399; MSA 6.1399 reads:

"The term of office of a justice of the supreme court shall be 8 years, beginning on the first day of January

next following the election and shall continue until a successor is elected and qualified."

## III. PRIOR CASE LAW

As a threshold matter, this is a case of first impression. When closely examined, prior Michigan case law fails to address the present situation.

At first blush, *People ex rel Andrews v Lord,* 9 Mich 227 (1861), would seem to resolve the case before us. In that case the incumbent probate judge was re-elected but died before the commencement of the new term. The Governor made one appointment for the unexpired term; a second appointment was made in January, when the new probate judge term would have commenced.

The 1850 Constitution provided, first, that a probate judge's term of office continued for a period of "four years, *and until his successor is elected and qualified"* (emphasis added), Const 1850, art 6, § 13, and, secondly, that a vacancy in the office of probate judge "shall be filled by appointment of the governor, which shall continue until a successor is elected and qualified". Const 1850, art 6, § 14.

Relying on these provisions, the Court unanimously invalidated the January 1 appointment, writing:

"These provisions are so free from ambiguity that there is no room left for construction. A person appointed to fill a vacancy can only be superseded by one who is duly *elected,* and holds in the same manner as if originally the incumbent until thus superseded. His term of office did not expire on the first day of January,

1861, unless some one elected and qualified was then ready to take office." *Lord, supra,* p 230.

This analysis is typical when the Constitution provides, as the 1850 Constitution did, that the appointee's term includes a holdover provision. See Anno: 164 ALR 1248. The result will also be achieved if the vacancy-filling provision does not specify a duration for the appointee's term, but the incumbent's term of office includes a holdover provision. The holdover language ensures that a vacancy will not occur merely by expiration of the term of office; an officer holds office until his elected successor replaces him. In the *Lord* case, holdover language appeared in both sections of the Constitution; in the present case it appears in neither.

The other cases of this Court cited by defendant are also distinguished on these grounds. In *Lawrence v Hanley,* 84 Mich 399, 400; 47 NW 753 (1891), the statute established the regular term for the office of county auditors at three years and until their successors shall be elected and qualified. In *Baxter v Latimer,* 116 Mich 356, 362; 74 NW 726 (1898), the term of office for field and line officers was established at "three years from the date of their election, and until their successors are commissioned". In both cases, this Court relied on the holdover provision to find that no vacancy occurred at the expiration of the incumbent officers' terms.

Therefore, while each of these cases would be useful in analyzing an appointment to an office or term containing a holdover provision, this is not the factual posture we are asked to address.

## IV. Rules of Constitutional Construction

Both parties recognize that the rule of "common

understanding" set forth in *Traverse City School Dist v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971), is the correct one to apply when construing a constitution. We agree. We stated in the *Traverse City School Dist* case:

"The primary rule is the rule of 'common understanding' described by Justice COOLEY:

" 'A constitution is made for the people and by the people. *The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it.* "For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, *the intent to be arrived at is that of the people,* and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, *but rather that they have accepted them in the sense most obvious to the common understanding,* and ratified the instrument in the belief that that was the sense designed to be conveyed." (Cooley's Const Lim 81)'

\* \* \*

"A second rule is that to clarify meaning, the circumstances surrounding the adoption of a constitutional provision and the purpose sought to be accomplished may be considered. On this point this Court said the following:

" 'In construing constitutional provisions where the meaning may be questioned, the court should have regard to the circumstances leading to their adoption and the purpose sought to be accomplished.' *Kearney v Board of State Auditors* (1915), 189 Mich 666, 673.' " (Emphasis added.)

In the final analysis, the issue of this case is what was the common understanding and intent of the people in approving §§ 2 and 23, as amended, of the Judicial Article.

As pertinent, §§ 2 and 23 read as follows:

Section 2

"The term of office shall be eight years * * *."

Section 23

"The person appointed by the governor shall hold office until 12 noon of the first day of January next succeeding the first general election held after the vacancy occurs, at which election a successor shall be elected for the remainder of the unexpired term."

## V. ANALYSIS

Both plaintiff and defendant claim that the meaning of art 6, § 23 is clear, but they disagree as to what the meaning is.

Plaintiff argues:

"Had the people desired to resurrect the gubernatorial authority to make an appointment until a successor was elected and qualified they could easily have done so, but they did not. Instead they provided for an interim appointment until the first possible general election at which a successor would be elected for 'for the remainder of the unexpired term.' The use of the phrase 'for the remainder of the unexpired term' in the second sentence of Const 1963, art 6, § 23, indicates that the sentence is only applicable when an election can be held *within* the unexpired term. In other situations the plain language of Const 1963, art 6, § 2, means that an appointee cannot hold office beyond the expiration of the term."

Defendant, on the other hand, argues:

"The meaning of § 23 is clear on its face. It says simply and directly:

" '* * * The person appointed by the governor shall hold office until 12 noon of the first day of January next succeeding the first general election held after the vacancy occurs * * *.'

"* * * There is no ambiguity; no interpretation is necessary * * *."

It will be noticed that defendant consistently fails to recognize the second half of the sentence on which she relies. The whole sentence, giving emphasis to the words she leaves out, reads as follows:

"The person appointed by the governor shall hold office until 12 noon of the first day of January next succeeding the first general election held after the vacancy occurs, *at which election a successor shall be elected for the remainder of the unexpired term.*" (Emphasis added.)

It is the phrase "remainder of the unexpired term" in this second half of the sentence on which plaintiff relies for his construction.

While defendant and amicus never argue beyond the statement in the first part of the sentence, it is rudimentary law that all parts of a document should, if possible, be construed together. Obviously this would apply with particular force to the different parts of the same sentence. Our first concern therefore must be to read the whole sentence together and determine whether the second part of the sentence impacts in any way upon the first part of the sentence quoted by defendant. If it does, and justifies differing interpretations by plaintiff and defendant, as seems apparent, then we must determine which interpretation is the proper one.

There is no question plaintiff believes the second part of the sentence impacts upon the first. Plain-

tiff contends that the phrase "for the remainder of the unexpired term" "indicates that [the first half of the] sentence is only applicable when an election can be held *within* the unexpired term". While defendant nowhere discusses whether there is any impact of the second part of the sentence, she must argue that it does not require "an election be held *within* the unexpired term" in which the vacancy occurs, for that would negate her contended right to continue in office.

We are therefore left with a very real argument as to whether "the first general election held after the vacancy occurs" has to be within "the unexpired term" in which the vacancy occurs or whether it may be within the subsequent unexpired term. The fact of the matter is that the sentence can be read either way, depending upon whether "the remainder of the unexpired term" refers to the term in which the "vacancy occurs" or the term in which "the first general election [is] held". If the former, the plaintiff prevails. If the latter, defendant prevails.

Analysis of the parties' contentions, therefore, reveals that however clear the first part of the second sentence of § 23 is, when read together with the second part, there is an ambiguity that must be resolved by interpretation.

This ambiguity does not appear where the vacancy arises sufficiently before "the first general election held after the vacancy occurs" so that both the election and the vacancy occur in the same term. Then, of course, the "election" reference and the "vacancy" reference are to the same term. For example, in the case of former Chief Justice COLEMAN resigning in the second year of her eight-year term, the appointee, Justice BRICKLEY, serves "until 12 noon of the first day of

January next succeeding the first general election held after the vacancy occurs", or until the end of the fourth year of Chief Justice COLEMAN's term. In this case, both the "vacancy" and the "election" occurred in Chief Justice COLEMAN's eight-year term, so the "vacancy" and the "election" references were to the same eight-year term. There is no revealed ambiguity under these circumstances.

The ambiguity arises when the "vacancy" and the "election" occur in different eight-year terms. For example, in the instant case the "vacancy" occurred in Justice MOODY's term ending noon January 1, 1983 and the "election" will occur in the succeeding term of eight years. Does the "remainder of the unexpired term" refer to the remainder of the "unexpired term" in which the "vacancy" occurred or the "remainder of the unexpired term" of the "term" in which the successor will be "elected?" The alternative chosen, of course, produces quite different results. If the "remainder of the unexpired term" refers to the term in which the "vacancy" occurred, then, of course, there would be no time to be served in the new term. If it referred to the term in which the election occurred, then there would be six years to be served. This difference indicates beyond peradventure that an ambiguity exists.

The question before us is how to interpret § 23 to achieve the result the people intended. We believe the people intended the reference point to be the term in which the "vacancy" occurs.

We will proceed to show (A) that § 2 clearly excludes the concept of Supreme Court justice holdover and that except for a few years this has been historically so; (B) that § 23 does not unambiguously provide for holdover and (C) balancing the alternatives of interpreting § 23 as not autho-

rizing a holdover and as authorizing a holdover, it appears to us convincingly that the intent of the people, if they had considered this matter, as they apparently did not, would not have been to provide for a holdover from one eight-year term to the next.

## A. § 2 Excludes Holdover

No intention on the part of the people to authorize holdover in office can be found in § 2 of the 1963 Constitution. Quite the contrary. There are a number of factors indicating an intention against holdover: (1) § 2 does not include holdover language; (2) lack of holdover language in § 2 for the Supreme Court justices contrasts sharply with holdover language for judges of other courts; (3) historically the general rule has been non-holdover Supreme Court justice terms; (4) there is case authority that language similar to § 2 is not authority for a holdover term; (5) holdover legislation cannot contravene the Constitution.

### (1) No Holdover in § 2 Language

Section 2 does not include holdover language. It states: "The term of office shall be eight years and not more than two terms shall expire at the same time." This language is abundantly straightforward. It contains none of the traditional holdover language such as "and until their successors are elected and qualified". It provides for eight years, no less and no more.

### (2) § 2 No Holdover Language Contrasts With Holdover Language Elsewhere

The finite eight-year term for Supreme Court justices in the Constitution is in stark contrast to the holdover terms prescribed for the Court of Appeals (art 6, § 9), the circuit court (art 6, § 12)

and the probate court (art 6, § 16). These terms are established for "a term of six years *and until their successors are elected and qualified"* (emphasis added). The inclusion of the traditional holdover language in the judicial provisions of §§ 9, 12, and 16 must dictate that the significant absence of this language in § 2 was intended. The people did not intend to annex a holdover term to the office of Supreme Court justice.

*(3) No Holdover General Rule Historically*

The Constitution has never used holdover language to designate the term of office for a Supreme Court justice. The 1835 and 1850 Constitutions established the term as a finite number of years. See Const 1835, art 6, § 2; Const 1850, art 6, § 2. The 1908 Constitution, art 7, § 2, provided: "The term of office shall be prescribed by law". The Legislature, pursuant to this authority, established finite terms on various occasions. See 1915 CL 12007; 1929 CL 3001, 13528; 1948 CL 601.2.

In 1954, the Legislature set the term of office as follows: "The term of office of justice shall be 8 years * * * *and shall continue until a successor is elected and qualified"* (emphasis added). 1954 PA 116, effective June 1, 1955; MCL 168.399; MSA 6.1399. In art 6, § 2 of the 1963 Constitution, the people definitively stated that the "term of office shall be eight years", thus deleting the holdover period in the term of office as created by the Legislature. The difference between the term of office of a justice before and after the adoption of the 1963 Constitution is made obvious by the emphasized language. Before the 1963 Constitution, the term of office included a holdover provision. If a candidate won an election and then died before his elected term began, the incumbent justice would hold over "until a successor was elected

and qualified". After the deletion of this provision in the 1963 Constitution, the incumbent would not hold over, and the office would remain vacant. The term was for eight years, and that was that.

So of the approximately 148 years from 1835 to date, the Constitution provided for a holdover term in setting the term of a justice of the Supreme Court in only eight years. Whether the 1968 amendment in providing for filling of a vacancy in § 23 changes this, we will subsequently consider.

*(4) Constitutional Silence No Authority for Holdover*

A holdover provision is not to be read into the silence of the Constitution. As this Court stated in *Toy ex rel Elliott v Voelker,* 273 Mich 205, 215-217; 262 NW 881 (1935):

" 'Until his successor is elected and qualified' is not esoteric language. The phrase is common in this State and elsewhere. The words are plain and have an accepted meaning in the law.

\* \* \*

"The term [of office of superintendent of public instruction] consists of a 'fixed tenure and a contingent term.' \* \* \* The hold over provision is purely conditional, on failure of an elected successor or his qualification. Thereby, the right of incumbent to hold over term does not end until his successor has been elected and has accepted the office by qualifying. So, barring contingencies, the office is held by an elected official. This is further than the Constitution goes in securing an elected officer in such other State offices, of at least equal importance and rank, as the lieutenant governor, secretary of State, State treasurer, auditor general and attorney general, *whose terms are fixed at two years without right of hold over. Constitution 1908, art 6, § 1. Even the governor does not hold over in case of the*

*death of his elected successor before the commencement
of the term."* (Citation omitted; emphasis added.)

Section 1 of article 6 of the 1908 Constitution
provided "There shall be elected at each general
biennial election a governor * * * for the term of
two years". The 1908 constitutional provision is
consequently effectively similar to § 2.

*(5) Legislation Cannot Override Constitution*

Nonetheless, defendant and amicus argue that
MCL 168.399; MSA 6.1399 creates a holdover term
for Supreme Court justices. This statute, enacted
in 1955, before the 1963 Constitution, states:

"The term of office of justice of the supreme court
shall be 8 years, * * * and shall continue until a
successor is elected and qualified."

This argument flies in the face of settled consti-
tutional principle. Where the Constitution has
spoken, neither the Legislature (nor the Supreme
Court for that matter) may amend the Constitu-
tion. *Pillon v Attorney General,* 345 Mich 536; 77
NW2d 257 (1956).

Section 2 of art 6 of the 1963 Constitution
definitely fixed the term of office for Supreme
Court justices at eight years. Therefore, it is not
within the power of the Legislature or this Court
to amend the Constitution by annexing a holdover
term. Section 2 sets forth a definite term of years,
and so it must remain until altered by the people
through constitutional amendment.

B. *Problems Interpreting § 23 as Holdover*

Having established that § 2 unequivocally estab-
lishes a fixed term of eight years with no holdover,
and having established that being *in pari materia,*

§§ 2 and 23 should be construed together, if possible, we turn to examine whether § 23 indicates a clear and unambiguous intent of the people to change the 1963 Constitution and the normal rule of no Supreme Court justice holdover.

There are two reasons why § 23 does not clearly and unambiguously require a holdover or its equivalent interpretation: (1) if § 23 is interpreted as requiring holdover, it allows for an unjust result; and (2) a holdover interpretation of § 23 would permit an appointed justice to hold over but deny that same right to an elected justice.

*(1) Holdover Interpretation of § 23 Can Have Unjust Result*

Section 23, as amended, states: "The person appointed by the governor shall hold office until 12 noon of the first day of January next succeeding the first general election held after the vacancy occurs, at which election a successor shall be elected for the remainder of the unexpired term." Under a holdover reading of this language, if defendant had been *elected* to succeed Justice Moody and had Justice Moody died prior to January 1, the Governor's appointee would have displaced the defendant from an office to which she had been duly elected. Obviously, this result— which permits divesting a duly elected officer of his or her office—is repugnant to the common understanding of the people who ratified the Constitution.

Additionally, this absurd result would not materialize if § 23 contained traditional holdover language. Under a holdover analysis, an appointee's term ends when an *elected* officer steps forward to claim the office. Under traditional holdover language, it is irrelevant whether the election which

grants the successor his right to office occurs before or after the vacancy occurs.

However, the inflexible language of § 23 dictates that the election must occur *after* the vacancy, thus giving rise to the absurd situation. As noted above, however, this repugnancy disappears if § 23 is read in conjunction with § 2; if § 2 confines the operation of § 23 to the term in which the vacancy arose, then appointments will terminate either by the replacement of the appointee by an official elected *after* the vacancy, or by the termination of the eight-year term in which the vacancy arose.

We find further support for our interpretation of § 23 in the legislation enacted to implement this section of the Constitution. Although the first portion of MCL 168.404; MSA 6.1404 generally tracks the Constitution, the last sentence is enlightening. Here the Legislature has provided that one who is elected to an office is not divested of his right to hold office because a vacancy occurs prior to the commencement of his term. Thus the Legislature has recognized the people's clearly expressed preference for *elected* justices, and has done so in a way consistent with our interpretation that the defendant's term ends with the eight-year limitation rather than the January 1 noon after the next election.

*(2) Holdover Interpretation of § 23 Prefers Appointed Justices Over Elected Justices*

Section 2 makes it clear beyond peradventure that elected justices have eight-year terms with no right to hold over. If interpretation gives § 23 the effect of a holdover term that would mean that an appointed justice would have the right to hold over but an elected justice would not.

The whole history of judicial selection in Michigan evinces a strong insistence on election of

judges and a limited grant of power of appointment. Of course, the people could provide for holdover appointments, but in the case of Supreme Court justices because of a strong contrary history it should not be presumed unless in clear and unambiguous language.

### C. *Problems Interpreting § 23 as not Holdover*

Two technical objections have been raised against interpreting § 23 as not a holdover provision. We are unpersuaded that either should override our interpretation.

(1) It has been pointed out that when a vacancy occurs after the last election in an eight-year term, the appointee cannot "hold office until 12 noon of the first day of January next succeeding the first general election held after the vacancy occurs", if the election must fall within the eight-year term as required by tying the "term" in "remainder of the unexpired term" to the "term" in which "the vacancy occurs". There is no question that the "until * * * the first general election" language in that situation becomes inoperative. But that is not an unjust result such as divesting a newly elected justice of his term of office. In fact, it would prevent that injustice.

(2) We are also aware that by interpreting § 23 as not a holdover provision, a Governor is authorized, in some circumstances, to make two appointments rather than one. Arguably, this result contravenes the constitutionally expressed preference for elected officials.

However, this criticism is without merit. Although two appointments may be allowed, this in no way decreases the number of elected justices that serve,[1] impedes the process for supplying the

---

[1] Defendant has also argued that our interpretation will create a

office with an elected official, nor favors an appointed over an elected official.

Additionally, for reasons more fully stated in Part VI, *infra,* the interpretation which allows two appointments actually ensures that the people's vote is given the greatest possible efficacy.

## D. *Conclusion*

While attempting to reinstate the gubernatorial appointment power which had been deleted from the 1963 Constitution, the drafters of § 23 created a latent ambiguity as to whether a holdover provision for the appointee was intended. Plaintiff argues that the Governor's appointment continues only for the unexpired time remaining of the eight-year term in which the vacancy arose. Defendant, of course, believes that the appointee's term extends until her elected successor takes office in whichever eight-year term that happens to fall. The language of § 23 alone does not lead ineluctably to either result.

However, the practical problems associated with the application of a holdover interpretation of § 23 and the policy advantages inherent in the adoption of a non-holdover interpretation convince us that a non-holdover interpretation is what the people would have intended had this issue confronted them.

---

critical shortage of appointees. Defendant feels it is absurd to suggest that anyone would surrender a respectable position to accept an appointment for a period of only a few weeks or months.

We are unpersuaded by this supposed difficulty. In 1933, a similar situation arose and was resolved without the dilemma defendant predicts. On August 31, 1933, Justice CLARK resigned four months before his term expired. Governor Comstock appointed THOMAS WEADOCK, a distinguished private practitioner, on September 1. This appointment continued only until December 31, 1933; on January 1, 1934, the winner of the April election stepped into office. Therefore, although the appointment lasted only four months, an appointee was found to fill the office.

The injustice which may arise from application of a holdover interpretation of § 23 weighs heavily against adopting such an interpretation. Also, an interpretation which grants appointed justices rights that are denied elected justices is inappropriate.

We therefore hold that § 23 is not a holdover provision. Rather, it authorizes the Governor to appoint only until the end of an eight-year term. The effort to appoint for the succeeding eight-year term is therefore null and void and defendant has no title to her office after noon on the first day of January 1983.

## VI. Policy Considerations

Much has been argued of the policy predilections underlying § 23. We find it clear beyond peradventure that the fundamental philosophy of the people in judicial selection is, and has been, the intent to reserve to themselves the right to choose their justices by popular election. This intent is expressed in various provisions of article 6.

First, the people have singlemindedly and tenaciously rejected the adoption of an appointed judiciary system. A well-meaning and powerful minority over at least the last 30 or 40 years has consistently endeavored to persuade the people that judicial selection should be exclusively by gubernatorial appointment. But those campaigns have never succeeded, even to the extent of gaining sufficient signatures to permit a referendum ballot. It is manifest that the people of Michigan have remained steadfast and convinced that the best method of judicial selection is through the popular ballot.

Second, in the 1963 Constitution the people not only expressed their intent that the people should elect their Supreme Court justices, they even divested the Governor of the right to fill vacancies as provided in previous Constitutions. This power was reluctantly restored by the 1968 amendment.

Third, the people declined to permit incumbent justices without renewed popular mandate to hold over. As discussed above, the right to hold over had been granted by a 1954 statute (MCL 168.399; MSA 6.1399) enacted pursuant to art 7, § 2 of the 1908 Constitution. However, in art 6, § 2 of the 1963 Constitution, the people definitively stated that the "term of office shall be eight years", thus deleting the holdover period in the term of office as created by the Legislature. After the deletion of the legislatively created holdover provision by the 1963 Constitution, an incumbent would no longer hold over if an elected successor was not ready to succeed him at the end of his eight-year term. Instead, the office would become vacant. The term was for eight years, and that was that.

Any fair appraisal of the Judicial Article of the 1963 Constitution prior to the 1968 amendment cannot fail to recognize that the people had with clarion voice made two points abundantly clear. First, the people were determined to use the elective process to select their justices. Second, the people did not want their justices to serve beyond an eight-year term without renewing their popular mandate.

In the light of this clear expression of the popular will to choose their justices by election to eight-year non-holdover terms, we examine the instant issue. Supreme Court Justice BLAIR MOODY had

just won an overwhelming mandate for a new term of office by about 300,000 votes over his nearest competitor when he unfortunately died before he qualified for his new term. The issue before us is whether the people intended that a Governor whose popular mandate had all but expired have the power to fill Justice MOODY'S new term beginning after the Governor had left office as well as the power to fill the vacancy for the few weeks remaining in Justice MOODY'S then current term and also the Governor's final term?

Given the people's clearly stated intention to elect their justices for eight-year terms *without holdover,* it is hardly credible that they would grant a Governor, especially an outgoing Governor, the power to fill a vacancy *with a holdover period.* This is particularly true when such an interpretation would mean giving an outgoing Governor the right to appoint to a term that did not even begin until the outgoing Governor's own popular mandate had expired.[2] The effect of this would be to deny the people expression of their most recent mandate in favor of a mandate already superseded. This would be a complete, 180-degree turnabout from the people's constitutional reliance on the electoral philosophy and process.

But that is what the defendant and amicus argue. They contend that the people have in their constitution clearly and unambiguously given an outgoing Governor in his last few months the power to appoint a person to a Supreme Court term that would include a term that would not commence until that Governor's term of office and power had expired. We believe that the people

_____
[2] The majority rule prohibits such an appointment. Anno: 75 ALR2d 1277.

have not indicated such a clear denial of their basic philosophy.

Nonetheless, both defendant and amicus have advanced two public policy considerations on behalf of their position, arguing that if plaintiff's theories prevail: (1) the independence of the judiciary will be undermined, and (2) the orderly management of government and the continued smooth operation of its branches during times of transition when no elected official is available to take the incumbent's place will be disrupted. Although we agree that these are necessary considerations in light of the nature of the case before us, we do not agree with the defendant's and amicus' dire predictions of the consequences of our decision.

As we have noted, the people have clearly expressed their desire for an independent judiciary, chosen by them at a special or general election. Despite this directive from the people, we are still faced with the fact that, regardless of whether plaintiff or defendant prevails in this case, we will have an appointed justice on this Court until the next general election in November 1984. The fact that defendant was a participant in the last election and garnered a significant number of votes does not affect her status as an appointed justice.

However, defendant and amicus argue that if plaintiff prevails, the judiciary will become subject to the whim and control of the Governor because, at the end of the term, the appointed justice may be removed or replaced if his or her performance is unsatisfactory to the Governor.

In the first place, under our interpretation of the

Constitution, the appointed justice is no longer entitled to fill the appointed office at the end of the term. It is not a matter of removing the justice from office; the expiration of the term automatically ends the justice's appointed status and right to hold the office, and the former justice again becomes merely a potential appointee. The Governor then has the power to appoint to fill the resulting vacancy, caused by the beginning of a new term of office which is not filled by an *elected* official.

In the second place, a potential appointee is always chosen for office at the pleasure of the Governor. Thus, it is true that the appointed justice will only be reappointed to the new term if the Governor is satisfied with his or her performance in office in the prior term. However, this is no different in effect on the independence of the judiciary than a judge from the Court of Appeals seeking to be appointed to a vacancy on our Court. That judge will only be appointed if his or her performance has been satisfactory to the Governor. Therefore, the possibility always exists that a judicial officer, in the hopes of securing an appointment, will feel the need to tailor his or her performance in office to the known desires of the Governor. Our holding today does not serve to lessen the independence of the judiciary any more than it was lessened when the Governor's power to appoint persons to fill judicial vacancies was restored.

Defendant and amicus also argue that the smooth operation of government will be disrupted by our holding, which creates a vacancy at the end of the term even when there is a qualified individual already in office, ready and willing to continue

in office until the next general election. They argue that the policy behind holdover provisions is to ensure continuity in governmental operations during times of transition when there is no elected successor to take office and that the existence of such a vacancy could unnecessarily disrupt such continuity.

We recognize that the result of our holding is that, near the end of one term and the beginning of a new term, there may be two different appointed justices to the same office within a relatively short period of time. However, we believe that any disruption this may cause will be minimal and short-term. A far greater disruption would occur if the Governor failed to replace a justice whose term had expired. However, this possibility exists any time there is a vacancy on this Court, should the Governor fail to exercise his or her power of appointment, and our holding does not make this possibility any more or less probable. We do not agree with defendant and amicus that the proper way to avoid this potential problem is to find that no vacancy exists at the beginning of the new term.

We wish to point out that our holding is not intended to announce a policy against holdover provisions for public office. There is much merit to defendant's and amicus' argument with respect to the benefits of holdover provisions; however, we think such provisions should be established by the people and not by judicial fiat.

## VII. RIGHT TO APPOINT IN NEW TERM

There remains consideration of whether the Governor in office at the time the justice's newly

elected term commences can appoint to office. This depends upon two factors. First, does a vacancy exist that permits a Governor to appoint? Const 1963, art 6, § 23. Second, does the opportunity to appoint exist within the limited operation of § 23, *i.e.*, that it applies only to the term in which the vacancy arose?

It is obvious that there is no impediment to appoint with respect to the second factor. The vacancy, if one exists, dates from the first day of the eight-year term so that the formula of the second sentence of § 23 works perfectly with respect to § 23 and § 2. The critical question, then, becomes whether a vacancy allowing appointment exists.

The first sentence of § 23 as amended reads pertinently as follows:

"A vacancy shall occur in the office of judge of any court of record or in a district court *by death, removal, resignation,* or *vacating of the office* * * *."

In the instant case, Justice Moody died during the prior term to the one to which he was re-elected. There is no question that his death created a vacancy in the current term he was serving. It is argued that death in a prior term does not create a vacancy in the succeeding term to which the decedent was elected, and there is some reason so to interpret § 23.

However, we are called upon to construe the intent of the people in the language they employed to address a problem that may arise from a variety of situations. The problem which § 23 attempted to rectify was the difficulty created by vacancies in judicial offices between elections. The

solution was to establish limited gubernatorial appointments. To prohibit gubernatorial appointment where the vacancy was created subsequent to a general election but prior to the succeeding eight-year term would in part defeat the general purpose of MCL 168.404; MSA 6.1404 (1970 PA 10).

The intention and even the literal text of § 23 can be reasonably and properly construed to accomplish its purpose. There is no question that in the new term a vacancy *exists* because of the death in the prior term. Therefore, there is a "death" which under § 23 allows the Governor to make an appointment. This would surely be the common understanding of § 23.

Additionally, it is difficult to reject the argument that there was a "vacating of the office" in the new term. It is impossible to vacate the office in the new term by failing to qualify or failing to take the office in the prior term. Whatever is done in the prior term has no effect on whether the office is vacated in the new term. The only way the new term of office can be vacated is by the office holder failing to qualify, take office, etc., during the new term.

Consequently, if a newly elected official goes to and stays in another jurisdiction and does not show up to qualify and take his new office after a reasonable time, it certainly can be said that the office was vacated during the term to which he was elected.

This presents us with the question whether the failure of a deceased person to qualify and take office is in principle any different from a living person failing to do so. It would appear to us that there certainly is no logical difference. As such there was a vacating of the office during the new

term. What is more, in our mind that would be the common understanding of the public generally.

We therefore hold that the incoming Governor can appoint to fill former Justice Blair Moody, Jr.'s new term to which he was elected in the 1982 election.

## VIII. Conclusion

Before restating our conclusions, it is incumbent upon us to express appreciation for the helpful and even commendable briefs and oral arguments, especially on such short notice.[3]

We hold that Const 1963, art 6, § 23 may operate only within the Supreme Court justice term in which the vacancy arose. Therefore, § 23 authorizes the Governor to appoint only until the end of an eight-year term.

In this case, Justice Moody died five weeks before the expiration of the term he was serving. Under § 23, the Governor was empowered to make an appointment only until 12 noon, January 1, 1983. The Governor's attempt to extend the appointment beyond January 1, 1983 is therefore null and void.

Additionally, we hold that a vacancy arose on January 1, 1983 which authorizes the current Governor to make an appointment to the office of Supreme Court justice. This appointment will continue until 12 noon of January 1 following the next general election.

---

[3] The disinterested public purpose of the admonitions by defendant and amicus concerning the media reports of judicial political bias would have been more impressive if uttered in a non-adversarial context.

Finally, we concur with our brother KAVANAGH.

Judgment against defendant will enter but without costs.

KAVANAGH, J. The Attorney General of Michigan brings this action in quo warranto, GCR 1963, 715.2(1), against DOROTHY COMSTOCK RILEY, defendant, to decide whether she presently possesses the right to hold the office of justice of the Michigan Supreme Court. Having granted plaintiff's application for leave to appeal prior to decision by the Court of Appeals, this Court has original jurisdiction. GCR 1963, 852, 816.2. By leave of Court, Governor William G. Milliken has intervened as amicus curiae.

We hold that a vacancy in the office of justice of the Supreme Court can arise only in a term of that office and that an appointee to fill such vacancy may not serve beyond the end of that term, and accordingly judgment of ouster may enter.

At the general election held November 2, 1982, Justice BLAIR MOODY, JR., was re-elected to an eight-year term of office on the Supreme Court, commencing at noon January 1, 1983. After re-election, but before his first term was to expire at noon January 1, 1983, and before qualifying for the new term, Justice MOODY died November 26, 1982, thereby creating a vacancy in the term of office he was then serving.

Pursuant to the command of the constitution that a "vacancy shall be filled by appointment by the governor", Const 1963, art 6, § 23, Governor Milliken appointed the defendant on December 9, 1982, to fill the vacancy left by the death of Justice MOODY. According to the terms of the commission issued to defendant, her tenure as an

appointed justice was due to expire January 1, 1985.

Governor Milliken's term as Governor expired contemporaneously with that of Justice Moody's first term at noon January 1, 1983. Governor James J. Blanchard, elected at the November, 1982, general election, began his term of office at noon January 1, 1983. Governor Blanchard has not attempted to appoint a person to the Court. The present action in quo warranto was commenced January 3, 1983.

We are asked to decide whether a person appointed to fill a vacancy on the Supreme Court arising in the last two months of a term of office may continue to hold office after the expiration of the term in which the vacancy arose, within the meaning of Const 1963, art 6, § 23.

The Attorney General argues that the term of office for justice of the Supreme Court is fixed at eight years without right of holdover. Consequently, Const 1963, art 6, § 23, means that one appointed to fill a vacancy arising within an eight-year term serves until January 1 following the first general election held after the vacancy arises or until the end of the term in which the vacancy arises, whichever event first occurs. Such an application of § 23 alone, argues the Attorney General, is consistent with the omission of holdover language in Const 1963, art 6, § 2.

The defendant, on the other hand, contends that a plain reading of Const 1963, art 6, § 23 yields the conclusion that one appointed to fill a vacancy serves until January 1 following the first general election at which a successor is elected and qualified, regardless of the duration of the term in which the vacancy arises. The constitution vests in the appointee an interim term, unrelated to the

term in which the vacating justice served. In addition, a justice has a right to hold over by reason of prior constitutions and MCL 168.399; MSA 6.1399.

Amicus curiae makes essentially the same argument as defendant.

The constitution provides the method for filling vacancies on courts of record. As originally adopted, Const 1963, art 6, § 23, called for special or general elections to fill vacancies, replacing for the first time the gubernatorial power of appointment. In 1968, § 23 was amended to reinvest the Governor with the power to fill vacancies by appointment. See *Schwartz v Secretary of State,* 393 Mich 42; 222 NW2d 517 (1974). Section 23 generally commands the Governor to fill vacancies which occur by death, removal, resignation or vacating of office. The second sentence of § 23 limits the Governor's power of appointment by defining the duration of the appointee's right to hold office. What the second sentence of § 23 means as applied to the present facts is the question to be answered.

Section 23, in pertinent part, reads:

"A vacancy shall occur in the office of judge of any court of record or in the district court by death, removal, resignation or vacating of the office, and such vacancy shall be filled by appointment by the governor. The person appointed by the governor shall hold office until 12 noon of the first day of January next succeeding the first general election held after the vacancy occurs, at which election a successor shall be elected for the remainder of the unexpired term."

In determining the meaning of § 23, we are mindful that constitutions, made for the people and by the people, are given the interpretation

that reasonable minds, the great mass of the people themselves, would give them. *Traverse City School Dist v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971). We must ascertain the common understanding, that meaning which a particular provision would naturally convey to the popular mind. *Carman v Secretary of State,* 384 Mich 443, 451; 185 NW2d 1 (1971).

The "plain meaning" of § 23 urged upon us by defendant and amicus is that an appointee to the Supreme Court serves until January 1 following the first general election at which a successor is elected and qualified, regardless of the point at which the vacancy arises in the term. Section 23, they argue, creates an unrelated, separate, interim term for an appointee. In the present case, this is but a holdover by the appointee of the preceding justice's term of office.

An appointee's tenure cannot be unrelated to the scheme of eight-year terms of office established by Const 1963, art 6, § 2. Because a person's right to hold office can only have meaning in the context of terms, whether for years or life or determinable upon the happening of some contingency, the established terms of office set out in § 2 are relevant to the meaning of § 23. We find that § 23 contemplates this and rather than carve out a term unrelated to the constitutional schedule of terms provides that a successor holds office for the remainder of the unexpired § 2 term.

In our view, the critical language of § 23 which puts into context the tenure of the appointee is the election of a successor "for the remainder of the unexpired term". The unexpired term referred to is the one in which the vacancy occurs, not the one in which the election is held. The expression

presupposes that an election can yet be held within the term in which the vacancy occurs to fill out the unexpired term. This satisfies the mandate of § 2 that justices be elected. An appointment is authorized only until the first general election can be held.

As further support for their view of the plain meaning of § 23, defendant and amicus argue that an appointee is given a right of holdover. This right of holdover, they say, is not unique to the 1963 Constitution, but was also present in Const 1850, art 6, § 14, and Const 1908, art 7, § 20. The present § 23 differs from the preceding two constitutions only by specifying the date (the next general election) at which a successor is elected and qualified.

The concept of a vacancy in an office entails the notion of the absence of a qualified person to exercise the powers of that office. The powers of an office can be exercised only during a term of that office so the period of a "vacancy" could not extend beyond the end of a term. If no appointment had been made to fill the vacancy in the term Justice MOODY was serving at the time of his death, the vacancy would have continued only until the term ended. That an appointee "to fill a vacancy" could serve in an office beyond the end of the term of that office is self-contradictory. We know of no case where the appointed justice was authorized to hold over where the vacating justice would not have been. The first appointee to the probate court in the case of *People ex rel Andrews v Lord,* 9 Mich 227 (1861), was held authorized to serve until a successor was elected and qualified. The Court cited provisions both for the term of office and for the tenure of the appointee, each of which included holdover language. Essential to the appoin-

tee's right to hold over was the concurrent right of the elected judge to hold over.

Const 1963, art 6, § 2 states a fixed and definite term of office of eight years. The elected holder of that term possesses no contingent right to sit beyond eight years. The constitution anticipates new terms occurring in each of the seven offices at eight-year intervals. So far as § 2 is concerned, at least, no event disturbs the commencement of these terms, which are ordinarily filled by election. So far as Michigan voters are concerned, a new eight-year term commenced at noon on January 1, 1983, which they filled at the last general election. It cannot be the plain meaning of § 23 that the death of Justice MOODY one month prior to the expiration of his term gave his appointed successor the right to extend that term for two years when Justice MOODY could not have done so. The appointee could not fill a vacancy and be clothed with greater rights than those held by the predecessor. We do not believe that § 23 may be read to alter the scheme of § 2.

As a separate argument, defendant and amicus contend that an elected justice does possess a right to hold over. Under this argument, Justice MOODY's failure to qualify after his election to succeed himself meant that no vacancy arose on January 1, 1983. The appointee stepped into Justice MOODY's first term of office to serve until a successor is elected and qualified at the next general election. The right of an elected justice to hold over, it is said, comes from MCL 168.399; MSA 6.1399, which reads:

"The term of office of justice of the supreme court shall be 8 years, beginning on the first day of January next following the election and shall continue until a successor is elected and qualified."

This statute, however, was last amended in 1954, prior to adoption of the 1963 Constitution, and since constitutional provisions prevail, only statutes predating the 1963 Constitution which are not repugnant to it have any force. Const 1963, art 3, § 7. The Legislature may not increase or diminish a constitutional term of office. See *Attorney General ex rel Cook v O'Neill,* 280 Mich 649, 663; 274 NW 445 (1937) (POTTER, J., *concurring).* That part of § 399 which attempts to add to the term of office of a Supreme Court justice contravenes Const 1963, art 6, § 2, and is therefore void.

We are further convinced that the constitution did not intend to authorize a Supreme Court justice to hold over because of the presence of express holdover language in other parts of Article 6. Court of Appeals judges, Const 1963, art 6, § 9, circuit judges, Const 1963, art 6, § 12, and probate judges, Const 1963, art 6, § 16, are all authorized to hold office for six years "and until their successors are elected and qualified".

Such language is conspicuously absent from § 2 stating the term of office for Supreme Court justices. *Expressio unius est exclusio alterius.* The contingent right of holdover is not an inherent incident of a term of office, *Toy ex rel Elliott v Voelker,* 273 Mich 205; 262 NW 881 (1935). We conclude that a Supreme Court justice's term of office is eight years without right of holdover. For this reason, *Andrews, supra, Lawrence v Hanley,* 84 Mich 399; 47 NW 753 (1891), and *Baxter v Latimer,* 116 Mich 356; 74 NW 726 (1898), cited by defendant and amicus, are inapposite.

The appointment to fill a vacancy in the final months of a term of office must end with the term. The appointee cannot succeed to rights greater than those held by the vacating justice.

Under the majority rule, which we here adopt, a public officer may validly make a prospective appointment to fill a vacancy certain to occur in a public office only where the appointing officer would be empowered to fill the vacancy when it actually occurs. Anno: 75 ALR2d 1277. Thus, Governor Milliken's appointment of defendant could not have any legal effect to fill the vacancy occurring January 1, 1983, because such vacancy arose after the expiration of his term of office. Although the vacancy was certain to occur on January 1, 1983, by reason of the death of Justice MOODY, it could not arise prior to January 1, 1983. A vacancy in an office is a vacancy arising during a term of office. In the present case, there was no vacancy to be filled in the new term of office until that term commenced.

The Governor in office at the beginning of the term to which Justice MOODY had been elected has the power to fill the vacancy arising in that term by Justice MOODY's inability to enter upon the duties of the office when the term began.

Judgment may enter. No costs, a public question.

CAVANAGH, J. I concur with the result reached by my brothers Justices WILLIAMS and KAVANAGH. I write separately to help clarify the meaning of § 23, which is at the heart of this controversy.

Section 23, as amended, states in pertinent part:

"A vacancy shall occur in the office of judge of any court of record or in the district court by death, removal, resignation or vacating of the office, and such vacancy shall be filled by appointment by the governor. The person appointed by the governor shall hold office until 12 noon of the first day of January next succeeding the first general election held after the vacancy

occurs, at which election a successor shall be elected *for the remainder of the unexpired term."* (Emphasis added.)

Plaintiff argues that the words "unexpired term" refer to the term of office which is in existence at the time the vacancy arises. In other words, § 23 contemplates the situation in which a vacancy occurs in a term of office, the Governor appoints an individual to fill that vacancy, and an election is scheduled to take place after the vacancy occurs and before the end of the term. In such a case, the appointed justice would serve in office until the election, at which point the elected successor would assume the office for the remainder of the unexpired term. Thus, if Justice Moody had died in November of 1979 and defendant had been appointed to the vacancy created by his death, defendant would have served in office until January 1, 1981, which is the first day of January following the 1980 election. The elected successor would then have assumed the office of justice on January 1, 1981, and served until January 1, 1983, at which point Justice Moody's term expired. The elected justice would thus have served "for the remainder of the unexpired term".

However, plaintiff argues that when a vacancy occurs in one term, and the next election is not scheduled to take place until the next term, the second sentence of § 23 does not give the appointed justice the right to hold over in office until the next election. This interpretation is necessary, plaintiff argues, because § 23 requires that the elected successor serve in office for the remainder of the unexpired term in which the appointment was made—an impossible situation if the unexpired term has ended before the election. Thus, if defendant remains in office until the first day of

January following the 1984 election, her successor would be elected to fulfill a nonexistent term, one which ended January 1, 1983.

On the other hand, on behalf of the defendant, my colleagues Justices Ryan and Brickley argue that the words "unexpired term" refer to the remainder of the term in existence at the time the election is held. In the instant case, this would mean that defendant's elected successor would serve in office from January 1, 1985 (which is "the first day of January next succeeding the first general election held after the vacancy occurs") until January 1, 1991, which marks the end of the eight-year term which Justice Moody was due to begin on January 1, 1983. Under this theory, the fact that the vacancy occurred in one term and the election is not held until the next term has no significance regarding the interpretation of the words "the unexpired term" found in § 23.

Our task in interpreting § 23 is to divine the intention of the people when they amended the section to its present form and to determine their common understanding of the effect of the amendment.

It is clear that the people of this state want an elected judiciary; they have consistently rejected any opportunity to adopt an appointed judiciary system. It is also clear that the people, by their adoption of art 6, § 2 of the 1963 Constitution, desired that an incumbent justice would not be permitted to remain in office beyond the expiration of his or her term without a renewed popular mandate. There is no holdover language in § 2; the term of office is stated to be eight years, *not* eight years and "until a successor is elected and qualified", as provided by the Legislature under the 1908 Constitution. MCL 168.399; MSA 6.1399.

In light of the express desire of the people to choose their justices by election to serve eight-year non-holdover terms, I join with Justices WILLIAMS and KAVANAGH in holding that an appointed justice may not hold over into a new term of office. The appointed justice may serve not more than two years, *i.e.,* until the next general election, *or* to the end of the term to which the appointment was made, *whichever occurs first.* This result is consistent with a reading of § 23, which concerns filling vacancies in office, in context with § 2, which concerns the length of a term of office. I am firmly convinced that the people did not contemplate, when adopting § 23, that an appointed replacement for an incumbent justice would serve beyond the end of the term of his or her predecessor in office. The rights of the substitute cannot be greater than the rights of the person being replaced; the substitute stands in the shoes of the predecessor. Thus, the common understanding of the people when adopting § 23 is that the elected successor to the appointed justice would serve in office for the remainder of the unexpired term, *i.e.,* the term of office in existence at the time the vacancy occurred and the appointment was made. If the term of office ends before an election can be held, the appointed justice's right to serve in office terminates, absent a new appointment.

To hold otherwise could lead to an impossible and unjust result, *i.e.,* the possibility of an appointed justice claiming the right to hold over into a new term when an elected successor is ready, willing and able to occupy the office. This would clearly be contrary to the people's express preference for an elected judiciary.

My brothers Justices RYAN and BRICKLEY summarily discard this possible occurrence by stating

that it "is so unlikely to occur that we need not
ignore the plain constitutional language in this
case". However, they do admit that § 23 could not
be utilized to extend the tenure of the appointee
beyond the original term when a successor is
already elected and qualified. This conclusion pro-
vides for an appointed justice to remain in office
until the first day of January following the next
election. What they are really saying is that § 23
allows the appointee to remain in office until the
first day of January following the next election
after the vacancy occurs, *providing* there is no
elected successor qualified and ready to take office.
This is *not* the clear language of § 23; to arrive at
this result, one must read a meaning into § 23
which is not present in its specific language.

I believe that this Court's interpretation of § 23
must be consistent; it must be applicable to the
situation in which there is no elected successor
qualified to hold the appointee's office as well as to
the situation in which there is an elected successor
to the appointee's office.

However, if an appointed justice may not hold
over into a new term of office, this results in the
conclusion that a new vacancy arises in the new
term when no elected successor is ready and quali-
fied to fill the office. Defendant argues that under
§ 23 a vacancy occurs in the office of a justice only
"by death, removal, resignation or vacating of the
office" and not by the completion of the term to
which the appointment was made. Defendant
claims that only one vacancy occurred when Jus-
tice Moody died in November, 1982, only one
power of appointment arose from that occurrence,
and Governor Milliken, then in office, exercised a
valid power of appointment by appointing defen-
dant to the vacancy. Since there was no death,

removal, resignation, or vacating of the office on January 1, 1983, defendant concludes that no new vacancy arose on that date and thus she still rightfully holds title to the office. Like my brothers Justices WILLIAMS and KAVANAGH, I disagree.

I believe that a vacancy arose on January 1, 1983, by reason of the death of Justice MOODY. He had been elected in November, 1982, to the term of office beginning January 1, 1983, and he was unable to fill the office on that date due to his death. The fact that his death did not actually occur in the new term is not inimical to this interpretation—there was still a vacancy created by his death because he was unable to fill the office to which he had been re-elected.

I prefer the foregoing analysis to Justice WILLIAMS' conclusion that there was a vacating of the office during the new term because Justice MOODY failed to qualify and assume the office. I do not believe one "vacates" an office one has never assumed.

However, Const 1963, art 4, § 38 provides that:

"The legislature may provide by law the cases in which any office shall be vacant and the manner of filling vacancies where no provision is made in this constitution."

Pursuant to this power, the Legislature declared that a vacancy in the office of a justice of the Supreme Court can occur when the person elected or appointed to fill the office "neglect[s] or refus[es] to take and subscribe to the constitutional oath of office and deposit the same in the manner and within the time prescribed by law". MCL 168.402; MSA 6.1402. Thus, when Justice MOODY failed to take the oath of office for the term commencing at noon on January 1, 1983, as required by Const

1963, art 11, § 1, a ·vacancy arose in that term of office.

I do not find the conclusion that Justice Moody's death created two· vacancies, one in the term he was serving and one in the new term, and that defendant, as a justice appointed to one vacancy, may not hold over to fill the second vacancy, to be repugnant to any constitutional or statutory language of which we are aware. Indeed, I believe this result logically flows from our interpretation of § 2 and § 23, rendered in light of the known desires of the people who enacted these sections, and best reflects the common understanding of the people with respect to tenure in office of an appointed justice.

This case has been an unusually difficult one for us. By its very nature, it has embroiled this Court in a partisan controversy regarding whether an appointee of an outgoing Republican Governor or one of the now-incumbent Democratic Governor has the right to sit on this Court and be designated an incumbent justice on the ballot for November, 1984, a designation which has the tendency to insure the election of such a justice.[1] Furthermore, this case is not only of constitutional significance to our state, but it is also of personal significance to us, as we have been faced with the difficult task of making a legal judgment involving one of our own colleagues. Certainly no one has disputed defendant's personal qualifications to hold office. However, we were called upon to legally interpret a section of our constitution, and, with our best efforts and good faith, this we have done.

RYAN, J. This is a quo warranto action in which

[1] 2 Official Record, Constitutional Convention 1961, p 3388, Address to the People concerning art 6, § 23.

the Attorney General seeks to oust Justice DORO-THY COMSTOCK RILEY from the Michigan Supreme Court.

The facts are simple and undisputed.

Our late brother, BLAIR MOODY, JR., held the office of Justice of the Michigan Supreme Court for a term expiring at 12 noon, January 1, 1983. At the election held in November of 1982, Justice MOODY was re-elected to a new eight-year term, scheduled to commence at 12 noon, January 1, 1983. On November 26, 1982, before taking the oath of office for the new term, Justice MOODY died. On December 9, 1982, then-Governor William G. Milliken appointed DOROTHY COMSTOCK RILEY, then a judge of the Court of Appeals, to the Michigan Supreme Court in a letter of appointment which declared that she was appointed "as Justice of the Michigan Supreme Court, to serve until 12:00 noon of the first day of January, 1985. (To fill the vacancy created by the death of the Honorable Blair Moody, Jr.)"

After filing the oath of office as Justice of the Michigan Supreme Court, Justice RILEY took her seat on the Court. The Attorney General admits that Justice RILEY was properly qualified and able to serve on the Supreme Court at that time.

At noon on January 1, 1983, the term of William G. Milliken as Governor expired and the term of office of Governor James J. Blanchard commenced. On January 3, 1983, the Attorney General filed a complaint for quo warranto in the Court of Appeals, naming Justice RILEY as "defendant". On the same date, an application for leave to appeal prior to decision by the Court of Appeals was filed in this Court questioning Justice RILEY's authority to hold title to the office of Justice of the Supreme Court after noon of January 1, 1983. An

order restraining the Court of Appeals from exercising further jurisdiction was entered on January 4, 1983. After briefs were filed and oral argument was heard, an order assuming jurisdiction of the complaint for quo warranto prior to decision by the Court of Appeals entered on January 8, 1983. Supplemental briefs were then filed, and oral argument on the merits was held on January 24, 1983.

· We hold that Dorothy Comstock Riley properly holds the office of Justice of the Michigan Supreme Court under the authority of Const 1963, art 6, § 23, and, in the alternative, under the authority of MCL 168.399; MSA 6.1399.

I

Justice Riley is entitled to the office to which she has been appointed because of the provisions of Const 1963, art 6, § 23 as amended. That section provides:

"A vacancy shall occur in the office of judge of any court of record or in the district court by death, removal, resignation or vacating of the office, and such vacancy shall be filled by appointment by the governor. The person appointed by the governor shall hold office until 12 noon of the first day of January next succeeding the first general election held after the vacancy occurs, at which election a successor shall be elected for the remainder of the unexpired term. Whenever a new office of judge in a court of record, or the district court, is created by law, it shall be filled by election as provided by law. The supreme court may authorize persons who have been elected and served as judges to perform judicial duties for limited periods or specific assignments."

The Attorney General argues, however, that the second sentence of § 23 "cannot be given an inter-

pretation which would permit an appointee to hold
office beyond the expiration of the current term";
that is, the term in which Justice MOODY was
serving at the time of his death and which expired
on January 1, 1983. The essence of the Attorney
General's position, and indeed that adopted by
Justices WILLIAMS, KAVANAGH, and CAVANAGH, is
that § 23 does not permit Justice RILEY to "hold
over" into the eight-year term which began on
January 1, 1983.
   We disagree.

## A

### *The text of art 6, § 23 includes "holdover" language.*

A plainer, simpler, or more direct statement of
the duration of the Supreme Court appointee's
tenure would be difficult to imagine or compose
than that which appears in the second sentence of
§ 23:

"The person appointed by the governor shall hold
office until 12 noon of the first day of January next
succeeding the first general election held after the
vacancy occurs, at which election a successor shall be
elected for the remainder of the unexpired term."

That language explicitly authorizes an appointee
to "hold over", and the general language of Const
1963, art 6, § 2, which fixes the term of Supreme
Court justices at eight years, cannot and does not
prohibit appointee "holdover" which is specifically
authorized by § 23.
   There is no question that a vacancy occurred
upon the death of BLAIR MOODY, JR., and that then-
Governor Milliken had the authority to fill that
vacancy. The second sentence of § 23 specifies how

long the appointee shall serve and when the election of a successor shall take place. Under that language, if the words used mean what they say, since the first general election which can be held after the vacancy occasioned by Justice MOODY's death will be in November of 1984, Justice RILEY is entitled to serve until "12 noon of the first day of January" of 1985. The Attorney General and our colleagues for ouster have agreed, in effect, that the words used in the second sentence of § 23 do not mean what they say and that the sentence should be read as though it said that an appointee may serve until January 1 following the next general election "only if it is possible to hold a general election before the term during which the appointee is appointed expires". Manifestly, the Attorney General's position is not based on any language found anywhere in the constitution. The second sentence of § 23 contains no provision to the effect that the appointee shall hold office until after the next general election "or until the original term would have expired, whichever comes first". Nor is such a proviso found in the second sentence of art 6, § 2 which merely states that the "term of office shall be eight years" and does not prohibit an appointee from serving either a special "interim" term or portions of two different terms.[1]

[1] In his excellent brief, amicus curiae argues that § 23 creates a special "interim" term that may terminate earlier, later, or at the same time as the "first" eight-year term. The Attorney General argues that § 2 provides only for eight-year terms. We believe that both arguments miss the point. The question is not whether Justice RILEY is attempting to serve parts of two terms or a single "interim" term. These are merely two different ways to conceptualize the same result. If § 23 can be fairly interpreted to allow Justice RILEY to serve until January of 1985, then § 2 cannot be read to require the opposite result. As is explained more fully hereafter, we find nothing inconsistent in one provision that provides for eight-year terms for elected justices and another provision allowing an appointed justice to serve the last month of one eight-year term and the first two years of the next eight-year term.

A remarkably comparable situation was addressed by this Court in *People ex rel Andrews v Lord,* 9 Mich 227 (1861). In that case the incumbent probate judge died after winning re-election but before beginning his new term of service. On November 26, 1860, Governor Wisner appointed Jacob Van Valkenburgh to fill the vacancy. On January 1, 1861, the newly elected Governor, Governor Blair, appointed a different person. In resolving the dispute as to who was entitled to the office, this Court looked to Const 1850, art 6, § 14 which provided:

"When a vacancy occurs in the office of judge of the supreme, circuit or probate court, it shall be filled by appointment of the governor, which shall continue until a successor is elected and qualified. When elected, such successor shall hold his office the residue of the unexpired term."

In determining that the first appointee, Van Valkenburgh, was entitled to the office as against the new Governor's appointee, the Court, referring to § 14, stated:

"These provisions are so free from ambiguity that there is no room left for construction. A person appointed to fill a vacancy can only be superseded by one who is duly *elected,* and holds in the same manner as if originally the incumbent until thus superseded. His term of office did not expire on the first day of January, 1861, unless someone elected and qualified was then ready to take the office."

Plainly, the language of Const 1850, art 6, § 14, and the 1968 amendment to Const 1963, art 6, § 23, are not identical. The difference, in relevant part, is in the "holdover" language. The 1850 version provides that the appointee serves "until a

successor is elected and qualified", whereas the present version declares that the appointee "shall hold office until 12 noon of the first day of January next succeeding the first general election held after the vacancy occurs, at which election a successor shall be elected for the remainder of the unexpired term".

The Attorney General would distinguish the *Lord* case on the theory that the 1850 constitutional provision contained "holdover" language, and the 1968 amendment does not. We think that conclusion is unsound and that no valid distinction can be made. Both provisions contain "holdover" language. The "holdover" language of the 1968 amendment to art 6, § 23, which fixes the very date and hour of the expiration of the appointee's tenure is simply more specific and certain than the more flexible "holdover" language of the 1850 Constitution which terminated the appointee's tenure at the time a "successor is elected and qualified".

For purposes of authorizing an appointee to "hold over" the expiration of one term and the beginning of another, the "holdover" language of the 1850 Constitution, authorizing an appointee to serve "until the successor is elected and qualified", is indistinguishable in law from the 1968 holdover provision which authorizes the appointee to serve until noon of January 1 following the election at which the appointee's successor is chosen. In fact, the original version of Const 1963, art 6, § 23, contained the same "until the successor is elected and qualified" holdover language as appeared in Const 1850, art 6, § 14. The 1968 amendment to Const 1963, art 6, § 23, simply substituted new holdover language authorizing an appointee to serve until a specific hour and date following the

general election held after the vacancy occurs.
Both the new and the old holdover language pro-
vide that an appointee may serve until the hap-
pening of an ascertainable event—an event that
may occur before, at, or after the end of the term
in which the vacancy occurred which occasioned
the appointment. The Attorney General, and my
colleagues who would oust Justice RILEY, appear to
accept the proposition that if the designated event
which terminates the tenure of the appointee is
the election and qualification of a successor, the
appointee may hold over into a new term while
awaiting the arrival of that event. What would
possibly justify a different result if the designated
event is the arrival of the first day of January
after the next general election?

B

*The "unexpired term" language of § 23 is
consistent with an appointee holding over into a
new term.*

My colleagues for ouster also accept the Attor-
ney General's argument that the following lan-
guage of § 23 is somehow inconsistent with an
appointee serving until after the next general
election:

"The person appointed by the governor shall hold
office until 12 noon of the first day of January next
succeeding the first general election held after the
vacancy occurs, at which election a successor shall be
elected *for the remainder of the unexpired term."* (Em-
phasis added.)

It is argued that the emphasized language nullifies
the plain English of the clause which goes before
it, if the "term" in which the appointee's predeces-

sor was serving expires before the next general election will be held.

That argument is unsound on two grounds:

The first is that the provision simply does not say what the Attorney General claims it means. It does not say that the person appointed shall hold office until January 1 next succeeding the first general election held after the vacancy occurs, *or until the expiration of the current term, whichever first occurs.* It might have said that, and, if the framers of § 23 intended that result, they undoubtedly would have said that or something like it. Certainly, had they intended § 23 to mean what the Attorney General and my colleagues say it means, they could not have obfuscated such meaning behind more abstruse or opaque language. A common-sense reading of § 23 simply does not produce from the words which appear there the strained and imaginative meaning suggested.

One of the most fundamental canons of constitutional construction is found in Judge COOLEY's injunction that:

"A Constitution is made for the people and by the people. *The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it.* 'For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, *but rather that they have accepted them in the sense most obvious to the common understanding,* and ratified the instrument in the belief that that was the sense designed to be conveyed.' " Cooley, Constitutional Limitations (6th ed), p 81, as quoted in *May v Topping,* 65 W Va 656, 660; 64 SE 848 (1909).

Can it be fairly said that, in ratifying § 23, the "great mass of the people" had in mind the strained meaning suggested by the Attorney General, including the conditioning and qualifying clause he must necessarily read into it, and that such meaning is "most obvious to the common understanding of the people"? To ask the question is to answer it. A meaning of § 23 more "dark [and] abstruse" than that suggested would be difficult to conjure.

A second reason for rejecting the idea that § 23 should be construed by reading into it the language of contingency my colleagues' interpretation requires is that such a construction misconceives the meaning of the "term" to which "the remainder of the unexpired term" language of § 23 refers. My colleagues conclude that the reference is to Justice Moody's term which expired at noon on January 1, 1983. We do not agree.

The sentence, repeated here for ease of reference, is:

"The person appointed by the governor shall hold office until 12 noon of the first day of January next succeeding the first general election held after the vacancy occurs, at which election a successor shall be elected for the remainder of the unexpired term."

The phrase, "unexpired term", refers to the regular eight-year cycle or "term" in which an appointee under § 23 is serving at the time his or her "successor shall be elected". Both a common-sense understanding of the whole of § 23, and traditional rules of grammatical construction, demonstrate that the prepositional phrase "for the remainder of the unexpired term" modifies and defines the immediately antecedent phrase, "a successor shall be elected" and, in doing so, de-

scribes the duration for which the successor is elected.

The term of office of justice of the Supreme Court is eight years and runs in a continuous and uninterrupted cycle. Const 1963, art 6, § 2. The term exists independently of any office holder or of a vacancy in the office. If a vacancy occurred in the office of Supreme Court justice and for some reason a Governor made no appointment to fill the vacancy, the eight-year term would continue to exist and continue to run. Similarly, if, at the expiration of an eight-year term no one chose to stand for election to the office and the incumbent chose not to stand for re-election, that would not affect the existence of the term or its length. An appointee, under § 23, is appointed to the "office" of Supreme Court justice to fill a vacancy. He or she is not appointed to a "term". Although the appointment is with reference to a term, the term does not define the vacancy or its duration. The plain and simple language of the vacancy-filling provision, § 23, does so.

When a vacancy occurs in the office of Supreme Court justice, one and only one of the following situations will exist on "the first day of January next succeeding the first general election held after the vacancy occurs". Art 6, § 23. (1) Two, four, or six years will remain to be served in the term in which the vacancy occurred; or (2) no time will remain to be served in the term in which the vacancy occurred and eight years will remain in the next ensuing term; or (3) six years will remain to be served in the term following that in which the vacancy occurred. The Attorney General argues, and my colleagues for ouster agree, that § 23 means what it says only in the first situation. They conclude that, in the second situation it

would not make sense to elect a justice to an unexpired term of zero years, and in the third situation, the "unexpired term" refers to the term in which the vacancy occurs, not the next ensuing term. Having posited that "the unexpired term" language of § 23 refers only to the term in which the vacancy occurs, § 23 is read out of the constitution for situations (2) and (3), including this case, with the statement that the section is simply "inoperative" in such cases for successor elections. Having concluded that § 23 is "inoperative" for successor elections under those circumstances, they reason § 23 is also "inoperative" as to the length of time an appointee shall serve in situations (2) and (3).

We note, initially, that the foregoing analogy by the Attorney General is not at all persuasive. Even if § 23 was "inoperative" for successor elections in situations (2) and (3), it does not follow that § 23 is "inoperative" for determining the tenure of an appointed justice. If the appropriate constitutional interpretation "is that which reasonable minds, the great mass of the people themselves, would give it", it is impossible to conclude that type (1) vacancies are to be covered by the specific "vacancy" provision of § 23, but that the other two types of vacancies are not to be resolved by the vacancy section at all but, instead, by turning back to an earlier and more general provision, § 2, that says nothing about filling vacancies at all.

More importantly, the successor election provisions of § 23 *are* operative in all three situations; if anything, this supports the view that the appointee tenure provisions are operative in the "holdover" situation. The correct interpretation of the phrase "the remainder of the unexpired term"

includes the so-called "second" term in situations
(2) and (3), *supra.* In situation (2), the "unexpired
term" is the new term, the "remainder" of which
is a full eight years, while in situation (3), as in
this case, "the unexpired term" is also the "sec-
ond" term, in which only six years will remain.

The unsupported assertion that "the unexpired
term" can refer only to the "first" term is directly
contrary to this Court's decision in the *Lord* case
which held that "the unexpired term" refers to the
second term if the first term has expired. My
brothers fail to recognize that *Lord* not only held
that the appointee Judge Van Valkenburgh was
entitled to "hold over" into a second term, but
that the relator Henry Andrews was then properly
elected to serve "the residue of the unexpired
term". Mich Const 1850, art 6, § 14. The appoint-
ment and election provisions were not declared
"inoperative" by the fact that "the unexpired
term" to which Andrews was elected was the
"new" term rather than the "old" term. If my
colleagues' analysis had been followed in the *Lord*
case, art 6, § 14 would have been declared "inoper-
ative". Recourse would then have been had to art
6, § 13, which set the term of probate judge at
"four years, and until his successor is elected and
qualified"; since § 13 had no provision for the
election of a successor to "hold his office the resi-
due of the unexpired term", compare Const 1850,
art 6, § 14, Andrews could not have been elected
for "the residue of the unexpired [second] term",
and Van Valkenburgh would have remained in
office until his successor was elected and qualified
at the end of the next four-year term. The *Lord*
case is simply not distinguishable on this point,
since the relevant 1850 constitutional language,
"the residue of the unexpired term", and "the

remainder of the unexpired term" language of the present constitution are virtually identical.

In this case, if Justice RILEY serves until January 1, 1985, a "successor shall be elected for the remainder of the unexpired term" in November of 1984. The "remainder" of the unexpired second term will be six years, until January 1, 1991. Section 23 covers this situation perfectly and completely, unless the *Lord* case is to be overruled. This interpretation is entirely consistent with art 6, § 2. If the language limiting the elected successor to the remainder of the eight-year term were not present, the successor might claim that his election marked the beginning of a new eight-year term, even if the term had only six, four, or two years left. The last sentence of § 23 does not render it "inoperative"; it merely harmonizes § 23 with the general rule that the "term of office shall be eight years". Article 6, § 2.

## C

*The "Justice FITZGERALD" hypothetical does not justify ignoring the plain language of § 23 in this case.*

The primary reason being advanced for ignoring the plain language of § 23 appears to be based on the principle that a literal reading should be avoided if it would produce an "absurd and unjust result".[2] The possibility of an appointed justice serving until January following the next general election is plainly not unjust or absurd under the facts and circumstances of this case; indeed, it is specifically authorized by § 23. However, in a hypo-

[2] *Salas v Clements,* 399 Mich 103, 109; 247 NW2d 889 (1976); *Aikens v Dep't of Conservation,* 387 Mich 495, 499; 198 NW2d 304 (1972); *cf. Owendale-Gagetown School Dist v State Board of Education,* 413 Mich 1, 8; 317 NW2d 529 (1982).

thet raised by the Attorney General in his brief and in oral argument, a case is posited in which a candidate is elected to a new term and his or her predecessor vacates the office after the election, but before the commencement of the new term. In such a case, it is argued, if § 23 is applied as written, an appointee might claim the right to remain on this Court for the first two years of the new term, despite the fact that the successful candidate is available and waiting at the door to begin the term.[3] It would be manifestly absurd and unjust, and contrary to the will of the people, to deprive a rightfully elected justice of his term by an unreasonable and excessively literal reading of § 23. It is suggested that this hypothetical result could be avoided by adopting the Attorney General's suggested construction of § 23, that an appointee cannot serve beyond the expiration of the term during which she is appointed. We are then asked to apply this construction of § 23, fashioned to avoid an unjust result in a purely hypothetical case, to the facts of this case.[4]

---

[3] For example, to use the Attorney General's hypothet, former Justice FITZGERALD's term of office was scheduled to terminate on January 1, 1983. He chose not to run for re-election. At the November 2, 1982 general election, Justice MICHAEL F. CAVANAGH won election to a term of office commencing on January 1, 1983. If a vacancy had occurred in Justice FITZGERALD's office after November 2, 1982, but before January 1, 1983, the Governor could have selected an appointee to fill the vacancy. The appointee might have argued that the plain language of art 6, § 23 allows him to remain in office until January following the next general election, despite the fact that the successor was already elected at the 1982 general election, *before* the vacancy occurred.

[4] This sort of reasoning was recognized and rejected in *Detroit Common Council v Rush,* 82 Mich 532; 46 NW 951 (1890). An act designed to prevent election fraud provided that voters must enter concealed voting booths by themselves, and while concealed from view prepare the ballot. It was argued that this requirement was invalid in its entirety, since a literal reading of the statute would deprive blind or crippled persons of their right to vote. Rather than reject the statute in its entirety, this Court held that the statute would be enforceable in the vast majority of the cases, but would not be enforced against voters physically unable to comply.

The short answer to that argument is that the hypothetical case is so unlikely to occur that we need not ignore the plain constitutional language in this case in order to avoid the imaginary dangers it is said to pose. A more complete response recognizes that the hypothetical case is easily distinguished from the present case by the simple fact that no successful candidate stands elected and qualified to take the seat currently held by appointee Justice RILEY.

It is a disingenuous suggestion for constitutional construction which requires that the language used in a constitution be stretched and contorted out of its common-sense meaning in order to accommodate every hypothetical factual scenario imaginable en route to applying it to the facts before the Court. A literal reading of § 23 in the hypothetical situation would thwart the will of the electorate and deprive a legitimately elected justice of his or her position on the Court. A literal reading of § 23 in this case does not produce such an "absurd and unjust" result.

The fact that § 23 could not be utilized to extend the tenure of an appointee beyond the original term when a successor is already "elected and qualified" does not justify the conclusion that § 23 can *never* allow an appointee to serve beyond the date the original term was scheduled to expire. The language of § 23 *shortens* the time an appointee will serve in those cases where more than two years remain in the unexpired term. We see no reason in law or logic why § 23 may not *lengthen* the time an appointee serves beyond the expiration date of the original term and until January following the next general election.

As has been observed, art 6, § 23, as originally adopted in the 1963 Constitution, provided that an appointed Supreme Court justice might serve or "hold over" beyond the date the first term was scheduled to expire:[5]

"A vacancy in the elective office of a judge of any court of record shall be filled at a general or special election as provided by law. The supreme court may authorize persons who have served as judges and who have retired, to perform judicial duties for the limited period of time from the occurrence of the vacancy *until the successor is elected and qualified.* Such person shall be ineligible for election to fill the vacancy." (Emphasis added.)

The revised art 6, § 23, approved by the voters in August of 1968, followed the same pattern as its predecessor. The first sentence provides the *manner* in which a vacancy is to be filled, while the second sentence defines the *duration* of the appointee's tenure and creates the possibility that an appointed justice might hold over:

"A vacancy shall occur in the office of judge of any court of record or in the district court by death, removal, resignation or vacating of the office, and such vacancy shall be filled by appointment by the governor. The person appointed by the governor shall hold office *until 12 noon of the first day of January next succeeding the first general election held after the vacancy occurs,* at which election a successor shall be elected for the remainder of the unexpired term." (Emphasis added.)

---

[5] The original language of § 23 makes crystal clear that art 6, § 2, does not limit an appointee's tenure to the end of the first eight-year term. If § 2 did not prevent an appointee selected by the Supreme Court from serving for portions of two terms, assuming it took that long for the successor to be elected and qualified, the identical unamended language of § 2 cannot be used to prevent an appointee selected by the Governor from serving portions of two terms.

As this Court said in *Schwartz v Secretary of State,* 393 Mich 42, 47; 222 NW2d 517 (1974), the purpose of the 1968 amendment was to restore the governor's power to fill vacancies. There is simply no basis on which to conclude that the voting public saw the 1968 amendment as a means of eliminating holdover appointments when, apparently, none of the learned jurists of this Court perceived such a purpose. *Schwartz, supra.*

The language defining how long an appointee may serve was changed by the 1968 amendment from "until the successor is elected and qualified" to "until 12 noon of the first day of January next succeeding the first general election held after the vacancy occurs". The new language recognized that the vacancy could no longer be filled at a special election, but would have to be filled at the next general election. The new provision simply specified "12 noon of the first day of January next succeeding the first general election held after the vacancy occurs" as a specific date by which time the appointee's successor would be "elected and qualified". Viewed in this light, it appears that the purpose of this language substitution was not to create a radical departure from the historic length of time an appointee was to serve, but merely to identify a specific, uniform date upon which the appointee would leave the bench if he were not his own successor.

Unquestionably, the drafters of the 1968 amendment to § 23 did not consider the possibility that the "first general election held after the vacancy occurs" would not always provide the first opportunity for the election of a successor. When, as in the Attorney General's hypothetical case, the successor has already been elected *before* the vacancy occurs, it is unnecessary, unreasonable, and im-

proper for the appointee to serve beyond the expiration date of the term in which he is appointed. In the case before us, the appointee's successor has not yet been elected and will not be elected until the next general election, to be held in November of 1984. Under these facts, § 23 authorizes Justice Riley to hold office "until 12 noon of the first day of January next succeeding" the general election at which her successor shall be elected.

Further support for the conclusion that § 23 authorizes Justice Riley to hold office until the January after her successor is elected is found in the constitutional definition of "vacancy", which includes "death, removal, resignation or vacating of the office". Art 6, § 23. Since a "vacancy" in the "office of judge" does not arise upon the expiration of the term during which an appointee takes the bench, there is no requirement that Justice Riley vacate her office. We also find noteworthy the use, in § 23, of the phrase "office of judge" rather than "term of office". Compare art 6, § 2. It is a vacancy in the "office" rather than the completion of a "term" that gives rise to the Governor's power of appointment. Only one "vacancy" occurred upon the death of Justice Moody; only one power of appointment was created in the Governor. Former Governor Milliken exercised that power by appointing Justice Riley to serve until January 1 after her successor was elected. A second vacancy did not spring into existence on January 1, 1983; the failure of the people to provide for gubernatorial appointment power upon the expiration of the first term is persuasive evidence that the appointee may remain in office beyond the date the first term would have expired.

My brothers' attempt to subordinate the plain language of art 6, § 23, to their strained interpre-

tation of art 6, § 2, is contrary to two fundamental rules of constitutional construction. "When there is conflict between general and specific provisions in a constitution, the specific provision must control." *Advisory Opinion on Constitutionality of 1978 PA 426,* 403 Mich 631, 639; 272 NW2d 495 (1978). Further, "if conflicting constitutional provisions cannot be harmonized, the provision adopted later in time controls." *Id.,* p 643. Both of these rules require that, to the extent art 6, § 2, can be construed to conflict with the provisions for filling a vacancy in art 6, § 23, the later-adopted and more specific provisions of § 23 must control.

## D

### *Michigan constitutional and legislative history favors appointee holdover.*

Our brother WILLIAMS' opinion strongly suggests that there has existed in Michigan an historical preference that appointees to vacancies in the Michigan Supreme Court not be permitted to hold over in office beyond the expiration of the term during which the appointment was made. Specifically, our brother's opinion states that in Michigan there is an "historical preference for an elected judiciary and non-holdover Supreme Court terms",[6] indicating, together with other factors,

[6] In absolute fairness to our colleagues, it is incumbent upon us to note that a very careful, and even sophisticated reading of the precise words used in the opinion claiming an historical preference for non-holdover is technically accurate.

Our colleagues state that there is an "historical preference for * * * non-holdover Supreme Court *terms".* (Emphasis added.) While the text of our colleagues' introductory language declares that Michigan has had a history of a preference for no holdover, upon a close reading of the body of the opinion it becomes clear that the history cited is one of an absence of language requiring or prohibiting holdover *in provisions concerning the terms of the Supreme Court.* That, of course, is technically correct. The provision for holdover by

"that the more limited appointment was the intent of the people".

While there can be no question that the people of this state have indeed indicated an historical preference for an elected judiciary,[7] it is clear beyond peradventure that the Michigan constitutional and legislative history reveals consistent adherence to a policy favoring the holdover of appointees to judicial vacancies until a successor is elected.

From 1850 until the constitutional convention of 1961, every constitutional and statutory provision which was concerned with the subject of judicial vacancies included provision for the appointee to hold over until a successor is elected. Even the plaintiff concedes that prior to the 1963 Constitution, Michigan law "would permit an appointee to hold over beyond the expiration of a current term and into the commencement of a new term". Plaintiff's brief of January 3, 1983, p 17.

Const 1850, art 6, § 14 provided:

"When a vacancy occurs in the office of judge of the supreme, circuit or probate court, it shall be filled by appointment of the governor, which shall continue until a successor is elected and qualified. When elected, such successor shall hold his office the residue of the unexpired term".

an appointee to a vacancy logically would, and does, appear not in a constitutional provision defining the *term* of office of the Supreme Court justice, but in provisions concerning the manner of filling of a vacancy and the duration of an appointee's tenure.

[7] How our colleagues' construction of the constitution, requiring two interim appointments instead of a single interim appointment, honors the people's preference for an elected rather than an appointed Supreme Court judiciary is unclear.

An implementing statute, 1851 PA 172, § 3, defined what circumstances created a vacancy, and another statute, 1857 PA 146, § 4, provided both that the appointee to the vacancy could hold over until a successor was elected and fixed the date of such election.

Similarly, the 1908 Constitution provided, in art 7, § 20:

"When a vacancy occurs in the office of judge of any court of record, it shall be filled by appointment of the governor, and the person appointed shall hold the office until a successor is elected and qualified. When elected, such successor shall hold the office the residue of the unexpired term."

A statute, 1954 PA 116, § 404, enacted as part of the 1954 Elections Code, preserved the constitutional right of an appointee to serve "until his successor is elected and qualified". When the statute was amended in 1955, and again in 1963, the provision for the appointee to a vacancy to hold over until the election of a successor was preserved. Other statutory provisions, while not specifically implementing the holdover provision of Const 1908, art 7, § 20, cannot be interpreted as prohibiting holdover. See 1915 PA 314, ch 1, § 4, part of the Judicature Act of 1915, which became 1948 CL 601.4, and continued in substantially the same form as RJA § 204 until its repeal in 1963. MCL 600.204; MSA 27A.204.

Therefore, before the ratification of the 1963 Constitution, Michigan had an uninterrupted history of constitutional provision for the appointee to a Supreme Court vacancy to hold over until a successor was elected and qualified, with statutory implementation declaring when such election would occur.

The 1963 Constitution, while doing away entirely with gubernatorial appointment to the Supreme Court, continued the historical tradition of allowing a Supreme Court appointee to hold over "until the successor is elected and qualified". Const 1963, art 6, § 23, as enacted. Within five years, however, the "mistake", as this Court characterized it, of doing away with gubernatorial appointment was rectified with the adoption, by the people, of present art 6, § 23. That provision perpetuated Michigan's historical preference for the holdover by an appointee to a Supreme Court vacancy and incorporated in the same provision what had historically been a legislative provision, fixing, with specificity, the time at which the election of a successor would be held.

The history, therefore, is one of continuous constitutional approval for an appointee to a Supreme Court vacancy to hold over until a successor is elected and not, as our colleagues' opinion suggests, a history of non-holdover indicating "that the more limited appointment was the intent of the people".

We conclude that Const 1963, art 6, § 23, standing alone, provides sufficient authority to sustain Dorothy Comstock Riley's claim to the office of Justice of the Michigan Supreme Court. However, since some of our colleagues disagree, we will discuss whether MCL 168.399; MSA 6.1399 provides an additional, independent basis for Justice Riley's position.

II

Justice Riley's authority to remain on this Court is legislatively assured because of the "holdover" language of MCL 168.399; MSA 6.1399 which provides:

"The term of office of justice of the supreme court shall be 8 years, beginning on the first day of January next following the election and shall continue until a successor is elected and qualified."

The Attorney General admits that if this statute is constitutional, Justice RILEY's situation is covered by its provisions and that she is thereby authorized to remain in office until her successor is elected and qualified. However, he argues that the above-quoted statute is "clearly repugnant" to Const 1963, art 6, § 2, which provides:

"The supreme court shall consist of seven justices elected at non-partisan elections as provided by law. The term of office shall be eight years and not more than two terms of office shall expire at the same time."

The Attorney General finds that clear repugnancy by drawing a negative inference from language which is not to be found in § 2, but is found in comparable sections of the judicial article concerning other courts of record.

The Attorney General and our colleagues contrast § 2 with the language of earlier constitutions[8] as well as the terms of judges of the Court of Appeals,[9] circuit judges,[10] and probate judges,[11] all of which provide for terms of a certain number of years "and until their successors are elected and qualified". The gist of the argument is that the drafters of the 1963 Constitution must have made a purposeful decision to delete the holdover clause from art 6, § 2, so as to prevent Supreme Court

---

[8] Const 1908, art 7, § 20; Const 1850, art 6, § 14; but see Const 1850, art 6, § 2.

[9] Const 1963, art 6, § 9.

[10] Const 1963, art 6, § 12.

[11] Const 1963, art 6, § 16.

justices from holding over. The argument, however, does not bear close scrutiny.

An examination of the Official Record of the Constitutional Convention of 1961 reveals that the deletion of the holdover clause was simply inadvertent. The constitutional provisions setting the length of judicial terms for various courts were introduced on a piecemeal basis, not as a unified package. Const 1963, art 6, § 9, concerning Court of Appeals judges, was introduced as Committee Proposal 92b, and did not originally contain a holdover clause. The holdover clause was added without debate by the committee on style and drafting, which did *not* have the authority to make substantive changes. Const 1963, art 6, § 12, concerning circuit judges, was introduced as Committee Proposal 93b, which did not originally contain a holdover clause. The holdover clause was added during the debate because it was "left out". 1 Official Record, Constitutional Convention 1961, p 1361. Const 1963, art 6, § 16, concerning probate judges, was originally Committee Proposal 94b which did happen to contain a holdover clause. No comment appears in the constitutional debate about that clause. Const 1963, art 6, § 2, was introduced as Committee Proposal 91a without a holdover clause. Not a single word of debate centered on the absence of a holdover clause, and no such clause was added to that provision. The Attorney General's conclusion that the "overwhelming sentiment" of the convention was to change the holdover clause is simply without support in the record.[12]

---

[12] We recognize that, after extensive debate, the convention decided to change the method of filling judicial vacancies from appointment by the Governor, see Const 1908, art 7, § 20, to appointment by the Supreme Court. Const 1963, art 6, § 23, as originally enacted. But this debate over how vacancies should be filled is largely irrelevant to a holdover clause, which prevents some vacancies from occurring by

In any event, interpretation of a constitution is governed by the common understanding of the people who adopted it, not the unrevealed intentions of the drafters. *Traverse City School Dist v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971); see also *Schwartz v Secretary of State,* 393 Mich 42, 47; 222 NW2d 517 (1974). It is impossible to conclude that the voters would have read art 6, §§ 2 and 23, as affirmatively prohibiting a holdover statute in the absence of language of prohibition and in view of a record of convention comments which includes no expression whatever of any intention to bring about a change from the 1908 Constitution on the holdover question. Similarly, the 1968 amendment to art 6, § 23, which originated in 1967 as Senate Joint Resolution A and House Joint Resolution F, purported only to change the method by which vacancies were filled and not the holdover result by which vacancies at the expiration of terms are avoided.

Even if the omission of the holdover language from art 6, § 2 of the Michigan Constitution was intentional, and there is no evidence to that effect, that does not render the holdover *statute* unconstitutional. Unlike the federal constitution, which grants only those powers specifically enumerated, the Michigan Constitution serves as a limitation on the plenary power of the Legislature. *Advisory Opinion on Constitutionality of 1976 PA 240,* 400 Mich 311, 317-318; 254 NW2d 544 (1977). The

authorizing the person holding the office to continue to do so until a successor is elected and qualified. Even so, the original version of Const 1963, art 6, § 23, provided authorization for interim judicial appointments "for the limited period of time from the occurrence of the vacancy until the successor is elected and qualified". The deletion of that phrase from the version of art 6, § 23, approved by the voters in 1968, appears to have been based on the assumption that the successor would always be elected and qualified no later than January 1 after the first general election after the vacancy occurred.

absence of constitutional holdover language *neither requires nor forbids* justices of the Supreme Court from holding over. The absence of any language affirmatively limiting the Legislature's power to provide for holdover means that the Legislature was free to provide for holdover by statute in MCL 168.399; MSA 6.1399. Similar language was first adopted in 1851[13] and has remained in effect up to the present day. We would not create a right of holdover where none existed, even if the failure to so provide in the constitution was purely adventitious. *Cf. Toy ex rel Elliott v Voelker,* 273 Mich 205; 262 NW 881 (1935) (dictum). But we will not create a constitutional prohibition against a statutory holdover when neither the language nor the intent of the drafters supports such a result.

Of course, one might argue, as our colleague does, that the phrase "a term of eight years" in § 2 is manifestly inconsistent with the phrase "until a successor is elected and qualified" in MCL 168.399; MSA 6.1399. If so, Michigan legislatures and constitutional conventions have been writing both inconsistent phrases into constitutional and statutory sections since 1850. Instead of attempting to invalidate the statute by seizing upon an arguable inconsistency, we should recognize that every statute comes to us clothed in a presumption of constitutionality, and that every attempt should be made to harmonize the statute with the constitution so that both might be upheld. *People v McQuillan,* 392 Mich 511, 536; 221 NW2d 569 (1974), citing *Cady v Detroit,* 289 Mich 499, 505; 286 NW 805 (1939); *Sullivan v Michigan State Board of*

---

[13] 1851 PA 175, § 95 provided that:

"The person holding any office, at the expiration of the term thereof, shall continue to hold the same until his successor shall be elected or appointed and qualified."

*Dentistry,* 268 Mich 427, 429-430; 256 NW 471 (1934): "However, it is the duty of the Court to give the presumption of constitutionality to a statute and construe it as constitutional unless the contrary clearly appears."

It is noteworthy that clear support for the validity of a comparable holdover statute is found in an opinion by the same Attorney General now challenging the constitutionality of such statutes. In OAG 1965-1966, No 4390, p 17 (February 2, 1965), the Attorney General considered the problem arising when the newly elected treasurer of Mason County died on November 9, 1964. The incumbent treasurer had not run for re-election. The question presented was whether the incumbent treasurer could hold over until his successor was elected and qualified, or whether the death created a vacancy at the end of the first term. Neither Const 1908, art 8, § 3 or Const 1963, art 7, § 4 provided a right of holdover for the county treasurer; however, neither constitution affirmatively prohibited the Legislature from enacting a holdover statute. The Attorney General concluded that MCL 168.203; MSA 6.1203 allowed the county treasurer to hold over. That statute is similar to the holdover statute challenged here. In fact, the two sections were enacted at the same time and signed into law as part of the same bill by then-Governor G. Mennen Williams. If the county treasurer holdover statute is valid in the face of a "fixed" constitutional term, then the Supreme Court justice holdover statute likewise passes constitutional muster.[14]

We hold that MCL 168.399; MSA 6.1399 is not

[14] Of course, the absence of a constitutional provision requiring holdover means that the Legislature is free to modify or repeal the statutory holdover. In response to the Mason County treasurer case, the Legislature chose to modify the holdover statute with respect to county officials. See MCL 168.206a; MSA 6.1206(1), enacted in 1965.

repugnant to Const 1963, art 6, § 2. Accordingly, that statute remained in force after the adoption of the 1963 Constitution, Const 1963, art 3, § 7. Justice RILEY may "hold over" under the statute until her successor is elected and qualified, even if Const 1963, art 6, § 23, did not authorize the same result on constitutional grounds.

Accordingly, the Attorney General's complaint for quo warranto is dismissed.

BRICKLEY, J., concurred with RYAN, J.

LEVIN, J. The 1963 Constitution eliminated the power of the Governor under the 1850 and 1908 Constitutions to fill vacancies in judicial office,[1] and provided that such vacancies shall be filled by vote of the people at a special or general election.[2]

---

[1] "When a vacancy occurs in the office of judge of the supreme, circuit or probate court, it shall be filled by appointment of the governor, which shall continue until a successor is elected and qualified. When elected, such successor shall hold his office the residue of the unexpired term." Const 1850, art 6, § 14.

"When a vacancy occurs in the office of judge of any court of record, it shall be filled by appointment of the governor, and the person appointed shall hold the office until a successor is elected and qualified. When elected, such successor shall hold the office the residue of the unexpired term." Const 1908, art 7, § 20.

[2] "A vacancy in the elective office of a judge of any court of record shall be filled at a general or special election as provided by law. The supreme court may authorize persons who have served as judges and who have retired, to perform judicial duties for the limited period of time from the occurrence of the vacancy until the successor is elected and qualified. Such persons shall be ineligible for election to fill the vacancy." Const 1963, art 6, § 23, as originally adopted, before amendment in 1968.

"A vacancy shall occur in the office of judge of any court of record or in the district court by death, removal, resignation or vacating of the office, and such vacancy shall be filled by appointment by the governor. The person appointed by the governor shall hold office until 12 noon of the first day of January next succeeding the first general election held after the vacancy occurs, at which election a successor shall be elected for the remainder of the unexpired term. Whenever a new office of judge in a court of record, or the district court, is created by law, it shall be filled by election as provided by law. The supreme court may authorize persons who have been elected and served as

The 1963 Constitution was amended in 1968 to authorize the Governor to fill a vacancy in judicial office until January 1 after the next general election following the vacancy at which, by vote of the people, a successor would be elected.

The constitution, as amended, thus contemplates that the voters will ultimately decide who shall occupy the seat vacated by the death of Justice Moody, and that the Governor makes an interim or temporary appointment.

The present inquiry, whether the Moody seat shall be occupied from and after January 1, 1983, until January 1, 1985, by the person, Justice Riley, appointed by former Governor Milliken or by a person appointed by present Governor Blanchard concerns not only the immediate question of who shall exercise the powers of the office of Justice of the Supreme Court during that period but also the question of who shall be designated on the ballot as an incumbent justice in the November, 1984 election.

There is substantial reason to believe that a decision by this Court for or against the claims asserted in this inquiry would, by "bestowing on the appointee" of the former or present Governor "the incumbency designation, [have] an overwhelming tendency to insure the election of the appointee".[3]

A decision of this Court in the instant inquiry may affect the outcome of the partisan controversy whether the nominee of a Republican or of a Democratic Governor should remain, or the candidate of the Republican or Democratic party con-

judges to perform judicial duties for limited periods or specific assignments." Const 1963, art 6, § 23, as amended in 1968.

[3] 2 Official Record, Constitutional Convention 1961, p 3388, Address to the People, concerning art 6, § 23.

vention should become, a member of this Court
from and after January 1, 1985, as a result of the
non-partisan election in November, 1984.

It appears from the diverse opinions of my col-
leagues[4] that substantial but inconclusive ar-
guments can be advanced for[5] and against the

[4] The markedly different approaches taken by my colleagues under-
score the difficulty of the question. Four of my colleagues believe that
the question can be answered by reference to the words and history of
the constitution, but reach different conclusions. Another argues that
the language of the constitution is inherently ambiguous and that the
question can be answered by a consideration of competing policies.

The opinions which support the right of the present Governor to
make the appointment argue that because the term of an incumbent
justice is fixed (art 6, § 2) at eight years without provision for hold-
over, § 23 should be construed as not providing that the special term
of an appointee holds over. This argument assumes that the drafters,
Legislature, and people would not provide holdover for an appointee
unless it were provided for an incumbent. An incumbent holdover
clause provides for continuity in office where a non-incumbent is
elected and dies or for some other reason does not qualify. An
appointee holdover clause provides for continuity in office where the
incumbent dies. There is inadequate basis for assuming that the
drafters, Legislature, and people would not have envisioned one rule
for one situation and a different rule for the other.

The opinions which support the right of the present Governor and
of the former Governor to make the appointment make opposing
arguments based on assumptions regarding the meaning of the words
"remainder of the unexpired term" without stating the bases for their
contradictory assumptions. That the opinions adopt such opposing
assumptions indicates that there is no clear basis for concluding
either that "the unexpired term" referred to is the one in which the
vacancy occurs or the one in which the election is held.

The opinions also appear to make contradictory assumptions re-
garding the length of the vacancy. One opinion assumes that a
vacancy must occur within a given term, so that it is self-contradic-
tory to assert that "an appointee 'to fill a vacancy' could serve in an
office beyond the end of the term of that office". An opposing opinion
assumes that an appointee "is appointed to the 'office' of Supreme
Court justice" and *not* to a term, and thus that the term does not
define the duration of the vacancy. I see no basis for making either of
these contradictory assumptions.

I agree with the Chief Justice that "[t]he language of § 23 alone
does not lead ineluctably to either result". For the reasons stated in
footnotes 7 and 8 *infra,* I believe that it is not appropriate for this
Court to make a policy judgment on this matter.

[5] The claim that the former Governor had the power to make an
appointment effective beyond January 1, 1983, is made on constitu-
tional and statutory grounds. The constitutional argument is ad-
dressed in fn 6.

claims asserted for and against Justice RILEY.

The language of § 23 is flawed and does not clearly answer the question whether § 23 provides that the "vacancy" created by the death of Justice MOODY shall be filled by the former Governor or the present Governor.[6] The answer, the meaning of

The statutory argument is based on § 399 of the election law (MCL 168.399; MSA 6.1399), which provides that the term of office of a justice shall be eight years and "shall continue until a successor is elected and qualified". It is argued that this language, which parallels the holdover language of the 1850 and 1908 Constitutions (fn 1 *supra)* regarding the filling of vacancies and the language of the present constitution with respect to the terms of judges of the Court of Appeals, circuit court, and probate court, provides for holdover.

The statutory language was enacted in 1954 (1954 PA 116), when the constitution authorized the Legislature to prescribe by law the term of office of justices of this Court, Const 1908, art 7, § 2. The present constitution does not authorize the Legislature to prescribe the term of office, but rather fixes the term at eight years.

The statutory language does not carry forward a holdover concept set forth in the 1850 Constitution. The 1850 Constitution fixed the terms of justices at eight years although it provided for holdover for circuit and probate judges. (Const 1850, art 6, §§ 2, 6, 13.)

The holdover provided for in § 23 differs from the holdover provided for in the 1954 statute in that the term of a justice appointed pursuant to § 23 does not "continue until a successor is elected and qualified" but rather until the January 1 following the next general election.

I agree with Justices WILLIAMS and KAVANAGH that the 1954 statute cannot change or modify the meaning of § 23, as amended in 1968.

Amicus cited cases from other jurisdictions. Many of the cases relied upon express holdover clauses in the provisions establishing the term of office. Others were based on provisions which expressly carved out special terms for appointees, unrelated to, uncontrolled by, and not part of the regular term of office. Still others addressed a factual situation where a newly elected official died rather than the incumbent. Some of the constitutional provisions involved clearly deal with the situation which confronts us, leaving nothing open to construction. None of the cases dealt with language and a factual situation such as is here presented.

[6] The purpose of the 1968 amendment of § 23 was to authorize gubernatorial appointment to fill vacancies but not new positions. The first sentence of § 23 provides that the Governor may fill a "vacancy" by appointment:

"A vacancy shall occur in the office of judge of any court of record or in the district court by death, removal, resignation or vacating of the office, and such vacancy shall be filled by appointment by the governor."

I agree with Justices WILLIAMS, KAVANAGH, and CAVANAGH, that ordinarily a vacancy occurs during a term of office and would not extend beyond the term of the office in which it occurs. As a result a person appointed to fill a vacancy ordinarily serves, by virtue of the appointment, for only the unexpired term of the office, determined as of the time the vacancy occurs.

But for the second sentence of § 23, there would be nothing in the language of § 23 to support an argument that a Governor has the power to appoint for a period of time extending beyond the expiration of the term of a judicial office in which a vacancy occurs.

It is the meaning of the second sentence, and any effect it may have on the meaning of "vacancy" in the first sentence, around which the legal arguments of this controversy revolve. The second sentence reads:

"The person appointed by the governor shall hold office until 12 noon of the first day of January next succeeding the first general election held after the vacancy occurs, at which election a successor shall be elected for the remainder of the unexpired term."

The political compromise expressed in § 23 and the other sections (§§ 20, 22, 24) of art 6 of the 1963 Constitution amended in 1968 (1) restored gubernatorial appointment to fill vacancies, (2) but not new positions, (3) the appointee, however, to be subject to voter approval or disapproval, (4) but not at a special election, rather at the first general election after the vacancy arises, (5) the appointee to serve a special term ending on the January 1 following the next general election, (6) the appointee to appear on the ballot by filing an affidavit of candidacy (§ 22), and (7) to be designated on the ballot as an incumbent (§ 24).

The issue presented concerns the time of commencement in the instant case of the special term ending on the January 1 next succeeding the general election. The Attorney General contends that while generally the special term would commence on the date the Governor's appointment of a person to fill the judicial vacancy becomes effective, where a new term of the judicial office commences on the January 1 next following the date on which the vacancy arises, the special term in respect to the new term commences on that January 1. It is contended on behalf of Justice RILEY that because the second sentence of § 23 provides that the person appointed *"shall* hold office until" the January 1 "next succeeding the first general election held after the vacancy occurs", the special term always commences on the date the Governor's appointment becomes effective even though a new term commences during the special term. (Emphasis supplied.)

This case illustrates, once again, the care with which new language amending the constitution must be drafted.

If, when § 23 was amended in 1968 to restore the Governor's power to fill vacancies, the language of the 1850 and 1908 Constitutions (see fn 1) concerning the Governor's power to fill judicial vacancies had been used, it would, I think, be our obligation to construe the language as empowering the former Governor to fill the vacancy. Had the 1850 and 1908 language been used, Justice RILEY would then hold the office of Justice of the Supreme Court "until a successor is elected

and qualified" (see fn 1), which, this Court declared in 1861, means "unless someone elected and qualified was then ready to take the office", *People ex rel Andrews v Lord,* 9 Mich 227, 231 (1861).

Section 23, as amended in 1968, does not say "until a successor is elected and qualified" but rather "until 12 noon of the first day of January next succeeding the first general election held *after* the vacancy occurs". (Emphasis supplied.)

The difference in language vitiates the dictum of *Lord* to the effect that if "someone" other than the appointee *had been elected* when the deceased incumbent (Justice Moody) was re-elected for a new term beginning January 1, the term of the appointee would terminate when that someone qualified because an elected successor "was then ready to take office". The dictum of *Lord* does not have the force of "precedent" because, while it could readily be said in *Lord* that "until a successor is elected" includes a successor elected *before* the death of the incumbent, and accordingly the language is "so free of ambiguity that there is no room left for construction", that cannot be said of a clause which would extend the term of the appointee until the January 1 following "the first general election *after* the vacancy occurs" in apparent disregard of whether a successor had been elected before the death of the incumbent.

In *Lord,* the Court said that by reason of the death of the incumbent, "the election had then fallen through. This was not a technical *vacancy"* (emphasis in original), *i.e.,* the new term, the period beginning January 1, is *not* a "vacancy".

*People v Lord* continued that although "this was not a technical *vacancy"* (emphasis in original), it was a case provided for in a statute authorizing a special election at which a successor shall be chosen to succeed a person elected but who dies "before the commencement of the term of service for which he shall have been elected". (1851 PA 175, § 2; 1857 CL 26.)

Starting with the dictum of *Lord* that this is not a technical vacancy, the question might be stated thus: is "shall hold office" until January 1 after the next general election a holdover clause so that an appointee serves beyond the January 1 expiration of the term in which the re-elected incumbent died?

A persuasive argument can be made that it is a holdover clause. The language of § 23 reads much the same as the language of the 1850 and 1908 Constitutions which clearly were holdover clauses. The opening words in the 1908 Constitution holdover clause, "[t]he person appointed shall hold the office until" reads in § 23, "the person appointed by the governor shall hold office until". (See fn 1 *supra* for the 1850 provision, which is parallel.) So far, one would conclude that the drafter, the Legislature, and the people had in mind a continuation of the concepts set forth in the 1850 and 1908 Constitutions.

Arguably the words of the present § 23, "12 noon of the first day of January next succeeding the first general election held after the vacancy occurs" merely restate the concept embodied in the 1850/1908 clause, "a successor is elected and qualified".

There is, however, an important difference between "until a successor is elected and qualified" and "until January 1 after the next

election". The 1850/1908 clause readily covers, as set forth in *Lord,* the contingency of a person other than the incumbent having been elected to a new term; the 1968 clause does not. One must read into the 1968 clause an exception for the situation where someone other than the incumbent has been elected for a new term which begins on the January 1 two years before the January 1 following the first general election *"after"* the vacancy occurs.

The second sentence of present § 23 must, therefore, all seem to agree, be deemed modified in some way. Those who contend that the former Governor was empowered to appoint for the disputed period might read in words to the following effect: "Unless a person (who subsequently does not, before taking office, die, resign or remove his domicile) other than the incumbent has been elected for a new term of office which begins on the first day of January next succeeding the day on which the vacancy occurs". Those who contend that the former Governor could not make an appointment for the period beginning January 1 would excise the words "a person (who subsequently does not, before taking office, die, resign or remove his domicile) other than the incumbent has been elected for" so that the modifying language would read: "Unless a new term of office begins on the first day of January next succeeding the day on which the vacancy occurs".

It is argued that the intent in saying in present § 23 "12 noon of the first day of January next succeeding the first general election held after the vacancy occurs" instead of "a successor is elected and qualified" was solely to eliminate special elections and that it was not intended to eliminate the concept of holdover that had prevailed for over a hundred years until 1963. It is argued that "the first general election *after* the vacancy occurs" should be read as if the clause said "until a successor is elected *at a general election"* without regard to whether the election is *before or after* the vacancy occurs.

There is, to be sure, on the facts of the instant case no difference in application between "until a successor is elected at a general election" and "the first general election after the vacancy occurs". A non-incumbent was not elected. Why then not simply conclude that "the first general election after the vacancy occurs" has the meaning of the holdover clause "until a successor is elected"?

Such a construction would fail to take into account the words, *"after* the vacancy occurs" in the context of a case where a non-incumbent is elected, and would also fail to take into account the failure to use the language of the 1850 and 1908 Constitutions.

The failure to use the language of the 1850/1908 Constitutions, "until a successor is elected", suggests that

(i) the drafter did not think about a new term intervening and whether the clause should be drafted as a holdover clause, *or*

(ii) if he did think about it, he either,

(a) was not aware of the judicial vacancy language of the 1850 or 1908 Constitutions, *or*

(b) if he was, chose not to adopt that language because

(I) he did not intend holdover, *or*

(II) if he did intend holdover, did not understand

that by using the language of the 1850/1908 Constitutions, he would incorporate the construction of *People v Lord* or the importance of doing so to avoid ambiguity.

We do not know why the drafter did not incorporate the construction of *Lord* by using the 1850/1908 language with the addition of a limiting "at a *general* election" after "until a successor is elected". It would be assuming a principal point in issue to conclude that although the drafter did not use the 1850/1908 language, he intended the meaning ascribed by *Lord* to that language.

The argument that the sole purpose of the drafter in using different language was to eliminate special elections, that he was saying only general and not special elections, cuts both ways. A drafter concerned with eliminating special elections may not have thought of holdover and accordingly of providing that there should be holdover. If he did not think about it, if he was thinking only of the case where on January 1 there was an unexpired term of less than 8 years and was simply saying "general election" not "special election", then it cannot properly be said that the clause was drafted as a holdover clause.

The holdover concept can be expressed in different ways. I am not saying that if the drafter had intended holdover, he would have used the language of the 1850/1908 Constitutions. Rather I am saying that where the drafter does not use language which has been construed by this Court to constitute a holdover clause and instead uses other language which is flawed, the non-use of the language already construed cannot be ignored by assuming that although different words were used, no different meaning was intended. The use of different words suggests, *although it does not necessarily mean,* that a different meaning may have been intended.

If the word "shall" in § 23 is read literally, then, if the incumbent, Justice MOODY, had been defeated and had then died, *or even resigned,* the former Governor could have appointed someone to take office instead of the person elected by the voters to succeed Justice MOODY.

The second sentence was drafted with the typical case in mind, without regard to the atypical case, leaving, as is often done, the atypical case to the courts as a matter of construction.

The term of judges of the Court of Appeals, circuit court, probate court, and district court are six years and of justices of the Supreme Court eight years. The likelihood is that any vacancy will occur during the first 5-1/2 or 7-1/2 years and not during the last six months or less of a term. The language of the second sentence of § 23 works, in general, for the typical case—where the vacancy occurs during the first 5-1/2 or 7-1/2 years of the term. In such a case there is at least six months of the term left, and the person appointed by the Governor can hold office until the first day of January next succeeding the general election held after the vacancy occurs *and* at such election a successor can be elected.

But the language is even then flawed. If the vacancy occurs during the last two years, two months of a term, a successor cannot be elected for "the remainder of the unexpired term". Also, if the vacancy occurs a few weeks or days before a general election, a

§ 23, depends on an evaluation of competing policy arguments.[7]

successor could not, as a practical matter, be elected at the "first general election held after the vacancy occurs".

If the second sentence of § 23 were a well drafted, carefully drawn sentence where everything or almost everything worked and with little or nothing left to construction, the Court might be obliged to proceed on the assumption that the mandatory "shall" in the clause "shall serve until" means exactly what it ordinarily plainly says. There being in such case reason to believe that the language was carefully and thoughtfully drafted to cover all contingencies, there would be no reason to adopt a meaning other than a literal meaning. But that cannot be said of § 23. The language is flawed in the sense that there are substantial questions left to construction.

[7] There is nothing in the structure or purpose of § 23 which would indicate that one construction of § 23 is preferable to another:

—Whether the Court decides the power of appointment was vested in the former Governor or is vested in the present Governor, a person appointed by "the governor" may run for office at the next general election, in November, 1984, by filing a certificate of incumbency with the mantle of the incumbency designation.

—A vacancy for six weeks does not impair the ability of this Court to function.

Justice Thomas E. Brennan resigned December 31, 1973; Justice John W. Fitzgerald was appointed January 7, 1974, a vacancy of seven days. Justice Thomas M. Kavanagh died April 19, 1975; Justice Lawrence B. Lindemer was appointed June 2, 1975, six weeks, two days. Justice John B. Swainson resigned November 7, 1975; Justice James L. Ryan was appointed December 16, 1975, five weeks, four days.

It is apparent that while a justice might be appointed as promptly as within a week, the Governor might also take as long as six or seven or even eight weeks to fill a vacancy—more time than is likely to remain of the unexpired term, having in mind that it is not likely that the vacancy will occur on the very day of the re-election of an incumbent justice. As a practical matter, because of the time that ordinarily elapses between argument of a case and decision, there is little a Governor's appointee to this Court can do in the relatively short time between an appointment after a November election and January 1.

The Governor-elect was in an as good a position as the former Governor to make an appointment of a person who could contribute to the work of the Court commencing with the arguments which were scheduled to be heard in January. Both Governors learned of the vacancy at the same time; neither was in a position to move more expeditiously than the other in choosing an appointee who could participate in the work of the Court beginning January 1.

Turning to vacancies in the trial courts, it appears that except in those situations where the Governor apparently had advance notice of an impending resignation, it generally takes two or three and some-

times four months and longer for the Governor to fill a vacancy on the circuit court. (This conclusion is based on a survey of the data regarding changes in the circuit bench in the last dozen volumes of Michigan Reports.)

If an incumbent Governor can take as long as four months to fill a vacancy, the Governor-elect, apprised of the situation, should be able to effectively appoint someone within a few weeks or at the most a month of the time an incumbent Governor is likely to make an appointment effective.

It is argued that preservation of the independence of the judiciary requires recognition that the power to appoint is in the former Governor. A Governor might, to be sure, not re-appoint someone appointed for a term ending on a January 1 for the full term beginning January 1, for obviously valid reasons such as that the appointee had become seriously ill or had been indicted for a serious offense. A Governor who failed to re-appoint a judge whom he was more or less committed to appoint for a full term, because he was dissatisfied with a decision in a particular case, would most assuredly be subject to a great deal of criticism. Moreover, it is again relevant that it is unlikely that a vacancy will occur so far in advance of January 1 that the judge appointed would be able to perform much in judicial duties between the effective date of his appointment and January 1. It is most unlikely that a person appointed to the Court of Appeals or the Supreme Court would both hear a case and file an opinion in less than two months. As for a circuit, district, or probate judge, it is not likely that the appointee will have the opportunity to do anything in the first few weeks of his or her tenure that would incur gubernatorial wrath.

It appearing that there is no compelling policy reason for conferring an immediate right of appointment for the full new term on the incumbent Governor, I turn to another aspect of the matter. Under our system of government, the term of a Governor or President does not expire on the morning after the date of a general election. There is a carry-over period in which a lame-duck Governor or President and a lame-duck Legislature or Congress exercise power. There is thus no policy against a Governor making an appointment for an unexpired term, whether the vacant office be a judicial or non-judicial office, to fill out the unexpired term albeit for a time extending beyond the term of office of the Governor making an appointment. But there is a dividing line. The incumbent Governor cannot make an appointment for a term which begins on or after the date that a new Governor's term begins.

Thus approached from a policy standpoint, while there is no impolicy in a Governor making a lame-duck appointment, his power to do so is generally limited to terms which begin during his term of office.

If one asks why the people would distinguish between a new term and an old term on the question whether a Governor could make a continuing appointment, the short answer is that that is the distinction which has always been drawn. There thus is nothing unusual in concluding that the incumbent Governor cannot make an appointment for a term which begins after his term expires.

The response to that might be that appointments to judgeships are

different. Judgeships are not partisan offices and while the distinction limiting the Governor's power to terms beginning within his term makes political sense as to a partisan office, there is no need to draw such a distinction as to a non-partisan office. Implicit in that argument is the notion that an appointment to the judiciary is non-partisan.

While Governors make non-partisan judicial appointments from time to time, judicial appointments are and are expected to be political, and hence may be and often are partisan. While the Governor is supposed to appoint qualified people and Governors have gone to considerable lengths to ascertain the qualifications of and to assure that qualified lawyers are appointed, political and hence partisan considerations do and are expected to enter into the appointment process. Indeed, the Governor is given the task (rather than a citizens' group) because he is a representative of the people chosen in a partisan manner and is expected to make a decision which is responsive to political concerns, which inevitably include the concerns of the political party to which he owes allegiance.

The point is not that the justices are partisan but rather that the process by which they come to this Court and are re-elected is a partisan process both at the appointment stage and at the nomination stage of the election and re-election process.

The reason this controversy is important to the parties is because political power is involved. If the office of Justice of the Supreme Court was a purely non-partisan office, it is doubtful whether this controversy would have become as important and would have so preoccupied the attention of the Court and some segments of the populace. The issue is of importance because it is important to both political parties that as many justices as possible emanate from their own appointing and nominating processes.

All justices and judges, those appointed as well as those elected, are products of the political process, including those nominated to the United States Supreme Court, the United States Court of Appeals and the United States District Courts, all of whom come through the political process in one form or another and many of whom reach their offices for partisan and other political considerations as well as because of their other qualifications as men and women and lawyers and judges. Charles Evans Hughes and William Howard Taft, Chief Justices of the United States, were prominent politicians—Hughes, Governor of New York, presidential candidate, Secretary of State; Taft, President of the United States.

One cannot properly conclude then that the judiciary is different, that an *appointment* to judicial office is supposed to be non-partisan and therefore, because it is of no political importance whether an incumbent or a newly elected Governor makes the appointment, the people might well have decided, or did decide, that a vacancy in judicial office would include the new term where the incumbent is re-elected and then dies before the new term begins.

I conclude that no policy argument favors recognizing a power to appoint for the disputed term in either the former or present Governor. Either Governor can be expected to appoint a qualified person based, at least in part, on political (partisan) considerations. A delay

I am of the opinion that it is not appropriate for this Court to decide, upon an assessment of competing policy arguments, which Governor had or has the power of appointment.[8] It is not in keeping

---

in appointment for even two months would not adversely affect the functioning of the Court. A short-term appointment would not impinge on the independence of the judiciary.

[8] There is a difference of opinion whether courts should decide all properly presented "cases and controversies". Herbert Wechsler argued that courts have a duty to decide all cases, see Wechsler, *Toward Neutral Principles of Constitutional Law,* 73 Harv L Rev 1 (1959), while Alexander Bickel would recognize a discretion in choosing the cases to decide, see Bickel, *The Supreme Court, 1960 Term, Foreword: The Passive Virtues,* 75 Harv L Rev 40 (1961).

One of the doctrines employed by courts to decline to decide cases is the "political question" doctrine developed by the United States Supreme Court.

Justice Frankfurter described the "political thicket" a court should avoid:

"Nothing is clearer than that this controversy concerns matters that bring courts into immediate and active relations with party contests. From the determination of such issues this Court has traditionally held aloof. It is hostile to a democratic system to involve the judiciary in the politics of the people. And it is not less pernicious if such judicial intervention in an essentially political contest be dressed up in the abstract phrases of the law.

*    *    *

"Courts ought not to enter this political thicket." *Colegrove v Green,* 328 US 549, 553-554, 556; 66 S Ct 1198; 90 L Ed 1432 (1946).

Alexander Bickel said:

"Such is the foundation, in both intellect and instinct, of the political-question doctrine: the Court's sense of lack of capacity, compounded in unequal parts of (a) the strangeness of the issue and its intractability to principled resolutions; (b) the sheer momentousness of it, which tends to unbalance judicial judgment; (c) the anxiety, not so much that the judicial judgment will be ignored, as that perhaps it should but will not be; (d) finally ('in a mature democracy'), the inner vulnerability, the self-doubt of an institution which is electorally irresponsible and has no earth to draw strength from." Bickel, *The Least Dangerous Branch,* 184 (Bobbs-Merrill 1962).

More recently Justice Brennan, speaking for the Court in *Baker v Carr,* 369 US 186, 217; 82 S Ct 691; 7 L Ed 2d 663 (1962), said:

"It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or *a lack of judi-*

with the spirit of the constitution for this Court to make a policy decision which will decide who sits on this Court.

It would encroach upon the right of the people to decide who sits on this Court or to decide who decides who sits on this Court, for this Court, in

cially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question." (Emphasis added.)

As Justice Brennan cautioned in Baker, a court does not label a case a "political question" merely because it is a "political case". It may do so when the controversy meets the criteria of the doctrine, and presents the dangers Professor Bickel and Justices Frankfurter and Brennan described.

In the instant case, the parties and the opinions of the justices canvass the standards said to control the resolution of this case. Although nominally a question of constitutional construction is presented, the opinions demonstrate that there is no principled nonarbitrary way to decide this case. It is "intractable" to principled legal resolution.

The "sheer momentousness" of this case in which the Court is asked to judge one of its own, and where the Court is asked to resolve policy issues as yet unweighed by the people, tends to "unbalance judicial judgment".

The policies here in conflict are fundamental ones in a constitutional democracy and beyond the competence of a court to decide. Making a policy choice regarding the composition of the Court between equally plausible views under such circumstances is not consistent with the concept that the people decide the composition of the Court. Such a decision may damage this Court's reputation for objectivity.

However this controversy is characterized, if the Court decides for or against the proposition advanced by the Attorney General, we are inevitably playing a role in the selection of a justice and doing so in one of the most highly politicized controversies that has come to this Court.

The constitution seeks to assure a strong and smoothly functioning Court. If a decision on the constructional issue would weaken the Court and impair its ability to function, then, in deference to that constitutional value, the Court should avoid such a decision.

We should carefully guard the reputation of this Court. Which Governor's appointee sits on this Court matters far less in the long run than that this Court continue to be, and be perceived as, impartial and objective.

the guise of construction, to recognize as duly authorized and appointed to this Court with an incumbency designation in the 1984 election an appointee of the former Governor, but not an appointee of the present Governor.

I have searched without avail for a principled basis of deciding between the competing constructions of the constitution set forth in the opinions of my colleagues.

Having found none, I am of the opinion that, in the circumstance that this Court's decision may affect the outcome of a partisan controversy concerning who shall become or remain our colleague, we should adopt a position of neutrality and that the decisions necessary to enable and permit this Court to function until January 1, 1985, should be posited on that approach and should neither advantage nor disadvantage one side or the other of the electoral controversy concerning a seat on this Court.

I am accordingly of the opinion that no judgment of ouster should be issued at this time by this Court in respect to the appointment of Justice DOROTHY C. RILEY by the former Governor or in respect to any appointee that shall be named by the present Governor to fill the MOODY seat temporarily until January 1 following the November, 1984 general election.[9] The quo warranto com-

[9] Alternatively, we could conclude that neither the appointee of the former Governor nor an appointee of the present Governor would be deemed duly authorized or appointed to succeed Justice MOODY.

Because § 23 provides for the filling of the vacancy created by the death of Justice MOODY by empowering "the governor" to fill the vacancy, albeit the meaning of § 23 is unclear whether the Governor so empowered is the former or the present Governor, the Legislature could not, in my opinion, provide by law, pursuant to Const 1963, art 4, § 38, for the filling of the vacancy created by the death of Justice MOODY.

A successor to Justice MOODY would then be elected by the people at the general election in November, 1984, unless, by vote of the

plaint filed by the Attorney General cannot be decided until four members of this Court vote to grant the relief prayed for therein or to dismiss the complaint.[10]

If the disposition of this controversy which I believe to be sound were to be adopted by this Court, both appointees would be regarded as justices appointed by a Governor, and, therefore, presumptively entitled to sit, neither taking precedence over the other. Justice RILEY would sit as a justice and exercise the powers of the office of justice of the Supreme Court, and an appointee named by the present Governor, having the constitutional qualifications and who takes the oath of office, would so sit and exercise such powers. Justice RILEY and such an appointee of the present Governor would both be authorized to file affidavits of candidacy and be designated on the ballot as incumbents in the November, 1984 election for the term ending January 1, 1991.

I acknowledge that if the disposition which I believe to be sound were adopted and the present Governor appoints a person who qualifies, there may appear to be eight justices on the Court while the constitution provides for seven.

This Court has discretion whether to accept for

---

people, the constitution shall have been amended to provide for filling the vacancy or choosing his successor in some other manner.

[10] No judgment of a trial court is here being affirmed by an equally divided court. Opinions joined in by less than four of the six participating members of this Court do not have finality. Today's disposition cannot, in my opinion, decide or adjudicate this controversy.

The court rule provides:

"Decisions by the Supreme Court. No motion shall be decided nor order entered by the Court unless all required documents have been filed with the Court and requisite fees have been paid and, except for affirmance of action by a lower court or tribunal by even division of the Justices of the Supreme Court voting thereon, decisions of the Supreme Court shall be made by concurrence of a majority of the Justices voting thereon." GCR 1963, 865.3.

decision any controversy.[11] There is a need, so that this Court can resume its functioning, to reconcile that discretion with the need not anticipated in the constitution to resolve a conflict concerning who may appoint to temporarily fill a seat on this Court. I believe that the disposition which I think to be sound is consonant with our constitutional obligation to resolve this conflict so that this Court can again address the heavy calendar that confronts it and our obligation to exercise our discretion with regard to the controversies with which it is appropriate that we grapple in a manner such that we do not involve the Court in partisan controversy.

There are no intractable problems in functioning with eight justices, and doing so would not or need not result in the effective casting of more than seven votes during the relatively short period of time between now and January 1, 1985. Until 1968, when Justice Theodore Souris resigned, the Court had for over fifty years been composed of eight persons and was able to function with that number. There would be no difficulty in the Court functioning for a short time with eight:

(i) Applications for leave to appeal could continue to be granted when four agreed unless two of the four were the appointees to the Moody seat in which event the application could be deemed denied. (Parenthetically, the United States Supreme Court grants a petition for certiorari when four, not five of the nine, justices agree);

(ii) Except for the election of a chief justice, votes on administrative matters are rarely decided by votes of four to three; a chief justice is not scheduled to be elected until after the 1984 election;

---

[11] See Const 1963, art 6, § 4.

(iii) If the Court were to be divided four to four in a case granted plenary consideration and the appointees to the MOODY seat are on the same side, the matter could be deemed to have been decided four to three the other way. On the other hand, if the appointees are on opposite sides, the Court has two options: it can delay the decision until after January 1, 1985, resubmitting the matter in January, 1985, to eliminate the vote of the one who is not elected in November, 1984, or if that may result in undue delay (a matter submitted between March 1, 1983, and say March 1, 1984), the matter could be remanded to the Court of Appeals for plenary consideration by that Court *en banc* as was done on one occasion when this Court was composed of eight justices at the time, May 13, 1968, when the cause was argued in the Court of Appeals. See *Mullins v Wayne County,* 16 Mich App 365; 168 NW2d 246 (1969).

There remains the question whether Justice RILEY or an appointee of the present Governor is the *one* entitled to file an affidavit of candidacy and to be designated on the ballot as an incumbent. That, of course, is precisely what is at stake and precisely what this Court should avoid deciding, because such a decision might encroach on the outcome of the election and would involve this Court in partisan controversy.

Because I am of the opinion that no judgment of ouster should be issued at this time, I join in the decision to deny issuance of a judgment of ouster.

## ORDER ENTERED FEBRUARY 11, 1983

This cause having been brought to this Court by complaint for quo warranto and due deliberation having been had of the complaint and of the briefs and oral arguments of the parties, and the Court

being equally divided upon the question of the right of defendant to hold the office of Justice of the Supreme Court after January 1, 1983, it is hereby ordered that the complaint is dismissed.

Pursuant to GCR 1963, 866.3(c) the Clerk is directed to issue this judgment order forthwith.

RILEY, J., not participating.

## ORDER ENTERED FEBRUARY 15, 1983

Upon reconsideration on the Court's own motion, there now being four justices who vote for ouster, the order of February 11, 1983 in this cause is vacated. This cause having been brought to this Court by complaint for quo warranto and due deliberation having been had of the complaint and of the briefs and oral arguments of the parties, it is hereby ordered and adjudged that defendant, Dorothy Comstock Riley, has, since the first day of January, 1983, claimed to exercise the office of Justice of the Supreme Court, and whereas, upon full consideration we find that claim from that date to be without authority, it is ordered that the said defendant, Dorothy Comstock Riley is hereby ousted and excluded from the office of Justice of the Supreme Court.

Pursuant to GCR 1963, 866.3(c) the Clerk is directed to issue this judgment order forthwith.

RILEY, J., not participating.

RYAN and BRICKLEY, JJ., state: We dissent from the Court's reconsideration of this matter and dissent from the judgment of ouster for the reasons stated in Justice RYAN's opinion of February 11, 1983.

Opinion Filed February 16, 1983

Levin, J. My opinion in the instant case, filed Friday afternoon, February 11, 1983, concluded with the following statement:

"Because I am of the opinion that no judgment of ouster should be issued *at this time,* I join in the decision to deny issuance of a judgment of ouster." (Emphasis supplied.)

The opinion also states:

"The quo warranto complaint filed by the Attorney General *cannot* be decided until four members of this Court vote to grant the relief prayed for therein or to dismiss the complaint.[10]" (Emphasis supplied.)

---

"[10] No judgment of a trial court is here being affirmed by an equally divided court. Opinions joined in by less than four of the six participating members of this Court do not have finality. Today's disposition *cannot,* in my opinion, *decide or adjudicate* this controversy." (Emphasis supplied.)

"The court rule provides:

" 'Decisions by the Supreme Court. No motion shall be decided nor order entered by the Court unless all required documents have been filed with the Court and requisite fees have been paid and, except for affirmance of action by a lower court or tribunal by even division of the Justices of the Supreme Court voting thereon, decisions of the Supreme Court shall be made by concurrence of a majority of the Justices voting thereon.' GCR 1963, 865.3."

---

The five opinions of the justices filed February 11, 1983, addressed the question whether the former Governor had or the present Governor has the power to make an appointment to fill the Moody seat for the period beginning January 1, 1983. The five opinions did not consider or address the separate question[1] of the effect on Justice

---

[1] Where a majority of the Court or of the participating justices signs one opinion, the consequence, to affirm or reverse, is ordinarily readily determinable from the opinion without regard to whether the bottom line (affirmed or reversed) is noted.

RILEY's authority to exercise the powers of a justice of this Court of the three different views[2] of

Where, however, less than a majority agree on an opinion—where, as here, less than four of the six participating justices voted either to recognize or deny the claim that the former Governor had the power to make an appointment effective for the period beginning January 1, 1983—it then becomes necessary to consider as a separate question the meaning or significance of the opinions of the justices.

While the question of the *meaning or significance of the February 11 opinions of the justices* regarding whether the former Governor had the power to make an appointment for the disputed period is a separate question from *whether the former Governor had the power to make an appointment,* the answer depends on the February 11 opinions.

The question whether a judgment of ouster should or should not be entered is not answered by asking how many votes are required to enter a judgment of ouster—GCR 1963, 865.3 requires a majority—but rather requires an analysis of the question whether, where the Court divides as it did on February 11, the meaning or significance of that division is that,

—because a majority of the justices participating were not of the opinion that the former Governor did not have the power to make the appointment, the allegation that he did not have the power has not been sustained (and, therefore, a judgment of ouster should not be entered), or

—because a majority of the justices participating were not of the opinion that the former Governor had the power to make the appointment, the claim that the former Governor did have the power has not been adjudicated favorably to that claim (and, therefore, a judgment of ouster should be entered).

There are two separate questions: (1) which Governor is or was "the governor" empowered to make the appointment (for the disputed period) to fill the vacancy which occurred because of the death of Justice MOODY, within the meaning of Const 1963, art 6, § 23 (the issue addressed in the February 11 opinions), and (2) the meaning or significance of the division of the Court in the February 11 opinions.

The decision whether to oust or not, albeit in a sense still a third question, flows as a matter of course once the second question is answered—once it is decided whether it takes a majority to sustain the allegation that the former Governor did not have the power or it takes a majority to recognize the power of the former Governor to make the appointment. The second question was not addressed in the February 11 opinions.

The second question, the meaning or significance of the February 11 opinions, is not and should not be a political or partisan question.

[2] Although my opinion filed February 11, 1983, states that I would not enter a judgment of ouster "at this time", that opinion did not constitute an affirmation of Justice RILEY's authority to exercise the powers of the office pursuant to the appointment for the period beginning January 1, 1983 made by the former Governor.

the justices on the question whether the former Governor had the power to appoint Justice RILEY for the period beginning January 1, 1983, or of an equal division of the Court on that question.

On consideration of the question of the effect of the five opinions of the justices, I am of the opinion that the ultimate question in the instant case is not whether one Governor or another is empowered to make the appointment for the period beginning January 1, 1983, but whether, by virtue of the appointment by the former Governor, Justice RILEY is empowered to exercise the power of the office of justice of the Supreme Court for the period beginning January 1, 1983.

However the question arises[3] or whatever the

Even if I had voted for the view that the former Governor was empowered to make an appointment for the period beginning January 1, 1983, there would still have been only three votes to uphold Justice RILEY's authority to exercise the powers of the office pursuant to the appointment made by the former Governor.

[3] The disputed issue of whether the former Governor had or the present Governor has the power to fill the vacancy created by the death of Justice MOODY should be decided on the basis of principles which do not depend on the manner or time the issue is presented.

The correct construction of the constitution, the correct resolution of the question "which governor is 'the governor' " empowered by § 23 to make the appointment, cannot properly depend on whether the present Governor made or makes an appointment before or after February 15 or ever makes an appointment or the form of action in which the question is presented.

It has been argued that Justice RILEY occupies the office until four justices decide that the former Governor did not have the power to appoint her. The grounds on which Justice RILEY asserts the right to sit after January 1, 1983, is the language of the former Governor's commission of appointment and a debatable construction of the constitution. However, an appointee of the present Governor would be armed with the same credentials and an opposing debatable construction.

Justice RILEY may not, although less than a majority of the justices are prepared to recognize her authority, properly be permitted to sit by default. Appointees of both Governors could claim such a right. To say one appointment takes precedence over the other because it bears an earlier or later date would be to adopt a principle of resolution that favors one side of the controversy over the other without a principled basis for doing so. Requiring a majority of the justices

form of action,[4] unless a majority of the six justices
(four) participating in the instant case agree that
Justice RILEY has been so empowered, her author-
ity to act has not been adjudicated favorably to
her claim of authority.[5] Absent an adjudication by

participating to recognize the authority of either Governor's appoin-
tee is a principle of resolution consistent with evenhanded disposition
of the dispute.

To hold that possession of the office is a factor and decisive would
be to create a holdover clause by a rule of construction regarding the
significance or meaning of the February 11 opinions although there
are not four votes to declare there is a holdover clause in the
construction of the constitution. To do so would be a tilt in favor of
holdover. There is no more reason to deem extra votes for holdover
than there would be to deem an extra vote against holdover because
there are not four votes for holdover.

Quo warranto actions (*Attorney General ex rel McKenzie v Warner,*
299 Mich 172; 300 NW 63 [1941]; *Attorney General ex rel Bean v
Showley,* 307 Mich 690; 12 NW2d 439 [1943]) where the holder of a
public office continued to occupy it because the Court was evenly
divided on the construction of a statute were decided before the
creation of the Court of Appeals or the adoption of GCR 865.3
providing that a decision in an original proceeding shall be made by
concurrence of a majority. Further, the results in those cases may
reflect a jurisprudence formulated before an action for a declaratory
judgment could be commenced to test the authority to hold public
office and recognition of a need to have a principle of resolution which
operates independently of the form of action.

As late as 1961, this Court declared that an action for declaratory
judgment "may not be regarded as a substitute for other legal
actions". *McLeod v McLeod,* 365 Mich 25, 33; 112 NW2d 227 (1961).
The court rules were amended in 1963 to provide: "The existence of
another adequate remedy does not preclude a judgment for declara-
tory relief in cases where it is appropriate." GCR 1963, 521.3; see 2
Honigman & Hawkins, Michigan Court Rules Annotated, Authors'
Comments, p 687. The authorities state that an action for a declara-
tory judgment is an appropriate and indeed the preferred means of
determining title to public office. 1 Anderson, Declaratory Judgments,
§ 189, p 382 (1951); Borchard, Declaratory Judgments (2d ed, 1941), pp
362-363, 858-862; *Developments in the Law: Declaratory Judgments—
1941-1949,* 62 Harv L Rev 787, 877 (1949). See also High, Extraordi-
nary Legal Remedies (2d ed, 1884), § 629, p 497, § 712, pp 568-569, and
§§ 748, 750, p 593.

[4] See fns 3 and 7.

[5] The need for applying this Court's generally applicable rule of
four (see GCR 1963, 865.3 quoted in text preceding fn 1 *supra)* in this
case becomes apparent if one considers the dilemma the Court would
confront if the present Governor had also made an appointment for
the period beginning January 1, 1983, and the Court had again

four justices favorable to Justice RILEY's claim of authority,[6] Justice RILEY should not and cannot

deadlocked. The controversy would remain unresolved and the Court could not function effectively unless a favorable vote of a majority of the justices participating (four) were required to recognize the authority of the appointees to sit, or the Court were prepared to recognize the authority of both appointees.

Analysis of the separate question of the meaning or significance of the opinions of the justices has been obscured by the decision of the present Governor to defer making an appointment of a justice for the disputed period although he has publicly asserted, with the support of the Attorney General in this action, that he has the power to do so.

If the present Governor had made an appointment and then two actions quo warranto had been commenced, or if an action for a declaratory judgment had been commenced on the question whether the former Governor had the power or the present Governor has the power to make the appointment, it would, based on the views of the justices reflected in the February 11 opinions, be evident that, unless the Court is willing to seat the appointees of both Governors, the appointee of neither can sit because less than a majority of the justices participating recognize the power of either Governor to make an appointment:

(a) if a majority of the justices participating is required to sustain an allegation that a Governor did not or does not have the power to make an appointment, complaints quo warranto should be dismissed as to the appointees of both Governors, or

(b) if a majority of the justices participating is required to recognize the power of a Governor to make an appointment, judgments of ouster should issue as to both appointees.

The Court, as a court, has not indicated a willingness to accept either alternative, to seat appointees of both Governors or neither Governor. Seating appointees of both Governors requires accommodations (see my February 11 opinion) which have not been agreed to by the Court or a majority of the justices participating. Seating appointees of neither Governor—functioning with six justices as the Court has since the death of Justice MOODY—does not require such accommodations; the Court could authorize "persons who have been elected and served as judges to perform judicial duties [as a seventh participant in the work of the Court] for limited periods or specific assignments". Const 1963, art 6, § 23.

[6] Because there were six justices participating and a majority (four) did not agree on whether the former Governor had or the present Governor has the power to make the appointment for the MOODY seat for the period beginning January 1, 1983, there is no decision of the Court on whether the former Governor had or the present Governor has the power of appointment to fill the MOODY seat for the period beginning January 1, 1983.

The judgment of ouster entered February 15, 1983 does not say anything about the meaning of the Constitution or the constructional question, "which governor is 'the governor'". It does not say that the

exercise the power of the office. Her participation in the work of this Court without an adjudication favorable to her claim would leave the question of the authority of her vote and of a decision of this Court in which she were to participate open to continuing dispute.[7]

Because less than four votes were garnered for the view that Justice RILEY's authority from and after January 1, 1983, should be recognized, a judgment of ouster, which could not properly be issued before consideration and determination of the separate question of the effect of the five opinions of the justices filed February 11, 1983, should now be issued.

I therefore join in the entry of a judgment of ouster at this time.

---

former Governor did not have the power to make the appointment; it does not say that the present Governor has such power. It reflects (i) the view of three justices that the former Governor did not have the power and the present Governor has the power *and* (ii) the view set forth in this opinion of the meaning or significance of the February 11 opinions.

[7] The question whether Justice RILEY has the authority to exercise the powers of the office might arise again by petition for rehearing, by a further complaint quo warranto (the present complaint having been dismissed without a decision on the merits), or a complaint for a declaratory judgment by the state or another litigant questioning Justice RILEY's authority or the authority of a decision of this Court. The question could also arise later this year or a year from now, early in 1984, on the question whether Justice RILEY is entitled to file an affidavit of candidacy or to designation on the ballot as an incumbent. If the present Governor were to make an appointment, this Court would be confronted with two claimants to the Moody seat.